Bertram J. FRIEDMAN

v.

UNITED STATES.

No. 130–55.

United States Court of Claims.

Jan. 15, 1958.

Paul R. Harmel, Washington, D. C., for plaintiff. Geiger, Harmel & Schuchat, Washington, D. C., were on the brief.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LITTLETON, Judge.

Plaintiff brings suit to recover disability retired pay from February 10, 1947, to the date of judgment herein, on the ground that the Air Force Board for the Correction of Military Records acted arbitrarily, capriciously and contrary to law in denying plaintiff's application for correction of his records to show him incapacitated for active duty and entitled to disability retirement with pay as of the date of his release to inactive duty on February 10, 1947.

Defendant contends that plaintiff has failed to establish facts which warrant the conclusion that the Air Force Board for the Correction of Military Records acted in an arbitrary manner. Defendant also contends that in any event, plaintiff has not stated a claim within the jurisdiction of this court because no cause of action can arise from decisions of correction boards which are approved by the Secretaries involved, whether arbitrary or not. Finally, defendant contends that plaintiff's claim, if he has one, is barred by the six-year statute of limitations because it accrued no later than February 10, 1947, the day on which plaintiff was released to inactive duty not by reason of physical disability and without retirement pay, and such date is more than six years prior to the filing of plaintiff's petition on March 29, 1955.

Plaintiff was commissioned a second lieutenant in the Army of the United States on August 30, 1943. He served on active duty in the grades of lieutenant and captain until February 10, 1947, during which time he was awarded the Purple Heart and the Air Medal. Plaintiff was not a member of the Army Reserve Corps.

On May 21, 1944, while piloting a fighter plane on return from his eighth combat mission over Germany, plaintiff's plane ran out of gasoline and he ditched it in the North Sea. As plaintiff bailed out at low altitude, the tail of his plane struck and seriously fractured his left leg. After floating in the water for about two hours, he was picked up by an English fisherman and taken to an English naval hospital in an unconscious condition where he received emergency treatment. The following day, plaintiff was taken to the Seventh General Army Hospital where a temporary cast and sutures were removed and a new cast was applied. On June 29, 1944, plaintiff was flown to the United States and treated at Lovell General Hospital and later at England General Hospital. Plaintiff underwent operations on his leg on November 21, 1944, July 2, 1945, and December 12, 1945. In April, 1946 the cast was removed from plaintiff's leg for the first time, and in May 1946, he was transferred to Pratt General Hospital, Coral Gables, Florida, for convalescence. On June 23, 1946, it was necessary to perform another operation on his leg which had commenced to drain again. On Oc-

tober 3, 1946, plaintiff appeared before a medical disposition board at Pratt General Hospital. The clinical summary which was issued by the disposition board found that there was moderate limitation of motion of plaintiff's left ankle in all directions and a moderate clawing of the left great toe; that the scar over the tibial region showed an area of previous drainage and that there was moderate atrophy of plaintiff's left calf and thigh muscles. The report also found that plaintiff had chronic osteomyelitis of the left tibia, which was incurred in line of duty and was improved. The disposition board recommended that plaintiff be returned to limited temporary duty status for a period of six months, at the end of which time he be reevaluated as to his physical status.

On October 9, 1946, plaintiff was ordered to appear before an Army Retiring Board. On October 16, 1946, plaintiff appeared at a hearing before the Retiring Board. Two medical officers, Lieutenant James and Lieutenant Watt, had been appointed medical witnesses to examine plaintiff, to prepare a report to the Retiring Board and to testify at the Retiring Board proceedings. These officers diagnosed plaintiff's disability in the same manner as had the disposition board. On their report the doctors indicated that in their opinion plaintiff was not at that time considered *permanently* incapacitated for general service or limited service, but should be reexamined and reevaluated as to his service connected injury after six months' temporary limited duty. At the hearing, Lieutenant James orally testified that in his opinion plaintiff *was* permanently incapacitated for active service by reason of a service-incurred injury to his leg in 1944. One of the board members pointed out to Lieutenant James that the medical disposition board had been of the opinion that plaintiff could be better evaluated in six months and asked Lieutenant James whether or not he agreed with that opinion. Lieu-

tenant James replied that in his opinion plaintiff was at that time permanently disabled. The board member then stated as follows:

"Q. What you are trying to say is: He is incapacitated at this time; but in a period of six months, for the benefit of both the government and the officer, you may be able to better evaluate his case? A. Yes, sir.

"Q. [Board member.] But you wouldn't say he is permanently incapacitated at the present time— you'd like to change your original statement? A. I didn't realize I had made an error in that testimony.

"Q. I asked the question: Is this incapacity for active service permanent? A. I don't know.

"Q. Would you rather evaluate it in six months from now? A. Yes, sir.

"Q. Then, you believe Captain Friedman should be recommended for six months' temporary limited service with reexamination and reevaluation at the expiration of that time? A. Yes, sir."

On the basis of the above testimony, we agree with the finding of the commissioner of this court (finding 7) that Lieutenant James changed his testimony to agree with the leading questions of the board member, from a statement that in his opinion plaintiff was then permanently incapacitated for further active duty, to a statement that plaintiff should be reevaluated in six months to determine the possible permanency of his incapacity.

The Retiring Board concluded that plaintiff was not permanently incapacitated for active service and recommended six months' temporary limited service with reexamination and reevaluation after the expiration of the six months. On October 22, 1946, plaintiff was notified of the findings and conclusions of the Retiring Board and was advised that if the recommendation for reevaluation

was approved by the Adjutant General, such approval would afford plaintiff the right to appear before an Army Retiring Board near his home, at his own expense, for the purpose of final determination of his physical status, provided he made written application to the Adjutant General for authority to make such an appearance. He was also advised that any authority granted by the Adjutant General for his future appearance before an Army Retiring Board would not operate to recall him to active duty. The findings and recommendations of the Retiring Board were concurred in by the Surgeon General and were approved by the Secretary of War on November 12, 1946.

Thereafter plaintiff elected to be released from active duty and separated from the service in accordance with the following form statement:

"Having been found not permanently incapacitated for active service and recommended for a period of 6 months' Temporary Limited Service with reexamination and reevaluation on or about 16 April 1948 by the action of an Army Retiring Board, I do not desire to remain on active duty for that period. I am eligible for separation at this time."

Plaintiff went on terminal leave on December 13, 1946, and was relieved from active duty February 10, 1947, not by reason of physical disability. It should be noted at this point that although plaintiff was technically relieved from active duty "not by reason of physical disability", he had been authorized to apply at a later date for reexamination and reevaluation of service-incurred disability to determine whether or not he was permanently disabled for active service and therefore entitled to disability retirement with pay.

In March of 1947 plaintiff requested authorization to reappear before an Army Retiring Board and was told that he could report to Tilton General Hospital for such reexamination and re-

evaluation. He was later advised that because of the high census in the hospital, he should seek to be recalled to active duty for the proposed period of hospitalization prior to appearance before the Retiring Board. Plaintiff was told that it was not possible to say how long it would take to get his case before the Board, but that everything would be done to expedite the matter.

Following his release from active duty, plaintiff had returned to New York City and was attempting to resume his civilian occupation as a court and verbatim reporter. He went to the Tilton General Hospital in June of 1947 and apparently discussed the matter of a Retiring Board hearing with several doctors whom he had previously known during his two and one-half years in Army hospitals. The record does not disclose precisely what these doctors advised plaintiff to do, but he did not remain at the hospital for appearance before the Retiring Board and explained his decision in a letter to the War Department dated June 24, 1947, as follows:

"From what they [the doctors at Tilton General Hospital] have told me, I believe that my best interests would be served by my going on the case that has been presented and on the records already before you.

"Therefore, I wish to thank you for the opportunity afforded me. And, due to all circumstances, at this time I do not wish to avail myself of the authorization sent me."

By this time plaintiff's leg was in such bad condition that he was unable to pursue his occupation in New York City because he could not stand up in the subways traveling to and from work. Accordingly, he moved himself and his dependent mother to Miami, Florida, and attempted to start in business there as a reporter. He experienced difficulty walking and standing for any length of time, and the scar on his left leg was continually peeling, sometimes leaving a bloody surface exposed. He went to the nearest Veterans Hospital for hydro-

therapy treatment,[1] but the long bus trip back from the hospital counteracted any benefits from the treatments because plaintiff usually had to stand in the bus.

On May 10, 1949, plaintiff filed an application for the correction of his military records. The Air Force Director of Military Personnel treated his application as an application for a further retiring board proceeding, and on September 15, 1949, plaintiff received a letter authorizing him to report to Oliver General Hospital for physical evaluation, including an appearance before a retiring board. On December 15, 1949, plaintiff was advised that the hospital would be able to admit him after Christmas. He entered Oliver General Hospital, Augusta, Georgia, on January 8, 1950. Plaintiff was not recalled to active duty for this purpose and made the trip at his own expense. On January 9, 1950, plaintiff was examined by three medical officers who found that although he had a limited flexing action in his ankle, painful scars, a three-eighths inch shortness of the left leg and a clawing of his toes, he was not incapacitated for general duty. On January 11, 1950, a medical board at the hospital recommended that plaintiff be returned to general military duty "and appear before a physical evaluation board" (formerly known as a retiring board). The medical board had concluded that plaintiff's disability was *partial and permanent*, and that plaintiff had become incapacitated on May 21, 1944, while serving on active duty.

On February 10, 1950, a formal hearing was held by a Physical Evaluation Board (the new designation for the old retiring board). The medical witness who testified at that proceeding was one of the doctors who had served on the medical board. That medical officer testified first that plaintiff was fit for general duty. Under questioning by board members, the medical witness conceded that plaintiff had not, since his injury, been capable of performing his "occupational specialty" of fighter pilot in the Air Force. The medical witness also testified that if the recommended "general duty" involved much standing or walking, plaintiff would be unable to perform such general duty. The witness testified that plaintiff was only fit to work at a desk if he was not required to stand or walk to any extent.

At the conclusion of the above hearing, the Physical Evaluation Board found unanimously that plaintiff was not capable of performing full military duty, whether it was general duty or duty as a pilot. The Board found that because of his incapacities he was required to lead a sheltered life. The Board also concluded that plaintiff was physically unfit for military service and made the following findings with respect to his degree of disability:

"1. Ankle, left, limited motion of.

"2. Scar, superficial, tender and painful on objective demonstration.

"1. Degree of severity, marked; is not the result of misconduct; is the proximate result of active duty; is permanent; is disabling; and carries a VA code number of 5271 and a 20 percent disability.

"2. Is not the result of misconduct; is the proximate result of active duty; is permanent; is disabling; is contributory to diagnosis #1; and carries a VA code number of 7804 and a 10 percent disability.

"Combined disability is 28 percent; converted to 30 percent."

On February 10, 1950, plaintiff, in writing, stated that he elected to be retired under Public Law 351 and on that date he was discharged from the hospital with the entry, "Discharged to resume inactive status, not qualified for duty, 30 percent disability."

For over two years no action was taken on the findings and recommendations of the Physical Evaluation Board, and plaintiff was advised that the reason for this

---

1. Plaintiff had received a 50 percent disability rating from the Veterans Administration and was then receiving a pension.

was that the enactment of the Career Compensation Act of 1949, 37 U.S.C.A. § 231 et seq., had created serious doubts as to whether an individual who had been relieved *from active duty* might later be considered for disability retirement. He was also advised that the Defense Department had decided that further legislation was necessary to clarify this point and such legislation was presently being drafted for presentation to the Congress.

On October 31, 1952, plaintiff was advised by the Air Force that the proposed legislation had been tabled and that it was felt by the Air Force that no further action could be taken on the disability retirement recommendations of the Physical Evaluation Board made in 1950. Plaintiff was advised that he should apply to the Air Force Board for the Correction of Military Records for further relief.

The above noted position of the Air Force was based on a ruling by the Comptroller General holding that reserve officers were not entitled to be considered for physical disability retirement if the determination of their eligibility had to be made *after* their actual separation from the service. In Updike v. United States, 132 F.Supp. 957, 132 Ct.Cl. 627, the court held that the Comptroller General was in error in his interpretation of the Career Compensation Act as barring reserve officers from consideration for disability retirement after their separation from active duty. This decision was not rendered until July 12, 1955, and accordingly it appeared, prior to that date, both to the plaintiff and to the Air Force, that plaintiff's only recourse was to the Correction Board.

Accordingly, on January 7, 1953, plaintiff filed an application for the correction of his military record. The only action taken by the Correction Board with respect to plaintiff's application was to request an opinion of the Executive Secretary of the Air Force Personnel Council. Apparently, the Executive Secretary of the Correction Board turned over to the Executive Secretary of the Personnel Council plaintiff's medical records, including the findings and conclusions of the Physical Evaluation Board (Retiring Board) of 1950 which had found that plaintiff was unfit for military service by reason of a 30 percent disability. In a memorandum dated May 29, 1953, the Executive Secretary of the Air Force Personnel Council stated that he disagreed with the disability rating of 30 percent arrived at by the Physical Evaluation Board, and stated that *in his opinion,* the prior findings of the January 1950 Medical Board should be "considered as a guide to action and those findings adhered to." As noted above, the Medical Board had found that plaintiff had a permanent partial disability but that he could be returned to general military duty. Furthermore, as noted above, the medical officer responsible for the report of the Medical Board had testified before the Physical Evaluation Board that plaintiff could only perform general duty *if* such duty required little standing or walking and that plaintiff could not, of course, perform duty in his occupational specialty of pilot. The Executive Secretary of the Air Force Personnel Council made no mention of this testimony. This testimony, among other things, was apparently the reason why the Physical Evaluation Board did not adopt the conclusions of the Medical Board but, on the contrary, found plaintiff to be 30 percent permanently incapacitated for any kind of active service.

In the opinion of the Air Force Personnel Council official, the 20 percent disability rating for limitation of ankle motion found by the Physical Evaluation Board should be reduced to 10 percent and no rating at all should be given for the painful scars which the Physical Evaluation Board had rated as 10 percent disabling.

Apparently impressed with the above opinion of the Executive Secretary of the Air Force Personnel Council, the Correction Board on September 18, 1953, advised plaintiff that his record did not establish a sufficient basis for a hearing and that no further action on his application was contemplated. We shall discuss hereinafter the composition and the

jurisdiction of the Air Force Personnel Council. On April 19, 1954, plaintiff submitted a revised application to the Air Force Board for the Correction of Military Records and on December 15, 1954, plaintiff was given a formal hearing before that Board, at which plaintiff appeared and testified at length. No medical witnesses testified at this hearing.

On January 21, 1955, the Correction Board issued its findings and conclusions and recommended that plaintiff's application be denied. On January 24, 1955, the Assistant Secretary of the Air Force informed plaintiff that his application for correction had been denied.

The findings of the Correction Board were, in our opinion, rather sketchy in view of the detailed medical record before that Board and the extensive testimony of the plaintiff himself. The findings did note that the 1946 Retiring Board had recommended limited duty for six months, with a reexamination and reevaluation thereafter; that the 1950 Medical Board had found plaintiff's degree of disability permanent and partial and had recommended general military duty; that the Physical Evaluation Board in 1950 had found plaintiff *permanently disabled* for further service by reason of 20 percent limitation in ankle motion and 10 percent painful scarring. In finding 13 of the Correction Board stated as follows:

> "13. The Physical Evaluation Board finding has been reviewed by the Secretary of the Air Force Personnel Council. That office is of the opinion that the medical evidence does not support a finding of unfitness, that the limitation of motion of the ankle should be rated at 10 percent, and that the scars do not appear to be sufficiently severe to be considered disabling and is not ratable."

The above finding 13 of the Correction Board gives the impression that a formal administrative review of the findings and conclusions of the Physical Evaluation Board had been made by the Air Force Personnel Council as a matter of recog-

nized administrative procedure and that the conclusions of the Personnel Council were a formal part of the record before the Correction Board. The record in this case shows that this was not true. The Air Force Personnel Council is composed of the following Boards: Air Force Personnel Board; Air Force Board of Review; Air Force Disability Review Board; Air Force Discharge Review Board; Air Force Decorations Board; Air Force Physical Disability Appeal Board.

The Air Force Personnel Council is an administrative activity established by the Secretary of the Air Force to recommend to the Secretary that action be taken under applicable statutes and regulations and to announce such action for the Secretary. Air Force Regulation 35–16 defines the functions of the various boards which comprise the Air Force Personnel Council. Only two of the boards comprising the Council have any connection with disability matters, i. e. the Air Force Disability Review Board and the Air Force Physical Disability Appeal Board. The Air Force Disability Review Board has jurisdiction to review the finding of a retiring or disposition board that an officer should be released from active service *without* pay for physical disability. Clearly in the instant case this Board, if it had been called upon, would have been without jurisdiction to review the findings of the Physical Evaluation Board that plaintiff *should be retired with pay* for physical disability. The Air Force Physical Disability Appeal Board has jurisdiction to review "certain cases arising under Chapter 61, Title 10, United States Code." No request for review by this Board was made by anyone in connection with Colonel Friedman's case. According to testimony of one of the Government's witnesses who had at one time served on the Council, the Council had no official or unofficial connection with the Air Force Board for the Correction of Military Records, but because the offices of the Council were located down the corridor from the offices of the Air Force

Correction Board, the Executive Secretary for the Correction Board occasionally solicited the informal advice of the Executive Secretary of the Air Force Personnel Council. Defendant's witness testified that this was apparently done with respect to plaintiff's application of January 7, 1953, to the Air Force Correction Board. Nothing in the memorandum written by the Executive Secretary of the Air Force Personnel Council indicates that he consulted with any medical officers who served on two of the five Council boards and had some connection with physical disability matters. The Executive Secretary of the Air Force Personnel Council did not see the plaintiff and did not consult with any physician who had examined plaintiff. The opinion expressed in the informal memorandum of May 29, 1953, appears to us to be a curbstone legal opinion. It also appears that the Correction Board was so impressed with this legal opinion that it denied plaintiff's original application (January 1953) in September 1953 entirely upon the basis of that opinion. Furthermore, after later reconsidering its denial of a hearing and granting plaintiff the hearing, the Correction Board continued to be impressed with the opinion of the Executive Secretary of the Air Force Personnel Council, which was the only opinion, legal or otherwise, adverse to plaintiff's claim except for the report of the 1950 Medical Board.

As noted earlier herein, that Medical Board had reported in 1950 that it considered plaintiff fit for *general* duty. However, when the medical officer who made the report was called on to testify before the Physical Evaluation Board, he admitted that plaintiff could not, in fact, have performed even the most general of duty unless it involved little more than sitting at a desk.

 Under the circumstances outlined above, the conclusion is inescapable that the Air Force Board for the Correction of Military Records did not base its conclusion in 1954 on the record which was before it. In fact, the Board does not appear to have put its mind on that record at all, but rather to have abdicated its statutory function and duty to the Executive Secretary of the Air Force Personnel Council. Such a failure by the Correction Board to carry out its statutory obligations and base its conclusions on the official record before it, appears to us to be arbitrary, capricious and contrary to law. If the Correction Board had desired to have another board review the percentage of disability findings made by the Physical Evaluation (Retiring) Board, there were medical boards in existence equipped to perform that function. The Executive Secretary of the Air Force Personnel Council was not qualified to perform this function and had no jurisdiction under the law or regulations to do so. We are of the opinion that the evidence before the Correction Board overwhelmingly supported the findings and conclusions of the 1950 Physical Evaluation Board that plaintiff was 30 percent disabled by reason of the service-incurred disability and that he should have been granted disability retirement with pay retroactive to the date of his release from active service on February 10, 1947. No other medical board considered plaintiff's case after 1950.

In view of the peculiar situation which developed in this case by reason, as above stated, of the erroneous interpretation of the Career Compensation Act of 1949 by the Comptroller General and the misapprehension as to the requirements of that Act by the Air Force (Updike v. United States, 132 F.Supp. 957, 132 Ct. Cls. 627), and in view of our opinion as to the true meaning of the statute, which authorized the establishment of correction boards by the Secretary of the Armed Forces concerned, and of the powers, duties and functions intended to be exercised and performed by such boards for the correction of military records, we think something should be said relative to the action taken in this case by the Air Force Correction Board in assuming authority to review and recommend to the Secretary that the findings and decision of the Retiring Board (Physical

Evaluation Board) be reversed—which recommendation we have concluded was arbitrary, and, for the reasons hereinafter stated, was illegal as an excess exercise of authority by the Correction Board.

 ██ Under the law, the findings and decisions of a physical evaluation board unfavorable to a member of the military personnel claiming retirement for physical disability are subject to review, first, by the Air Force Disability Review Board, and, second, by the Secretary concerned. The Correction Boards were established for the purpose only of reviewing, on application of a member of the military personnel, a military record to correct errors or injustices *against* such personnel and not to review and reverse decisions of other established boards *favorable* to such personnel. The Government is given no right by statute or regulation to apply or appeal to a Correction Board for the purpose of asking that Board to change a record by reversing a decision of a Retiring Board. The Secretary of the service concerned may, of course, decline to give his approval to a finding and decision of a Retiring Board, but a Correction Board is not a Medical Board or an agency through which he may take such action. The Surgeon General is usually the official from whom the Secretary seeks an opinion or advice as to whether he should approve or deny a finding and decision on disability by a Retiring Board.

 It appears, as we have indicated, that solely due to a misapprehension on the part of the Air Force as to the requirements of the Career Compensation Act of 1949 (as interpreted by the Comptroller General), the favorable findings and recommendations of the 1950 Physical Evaluation Board (retiring board) were never approved by the Secretary of the Air Force. There is nothing in the record of this case to indicate that, but for the position taken by the Comptroller General (prior to the decision in the Updike case), the Secretary would not have approved the findings and recommendations of the Physical Evalua-

tion Board and placed plaintiff on the disability retired list with pay. Accordingly, when, upon the erroneous advice of the Army officials, plaintiff took his case to the Correction Board in 1953, with findings and decision favorable to him, the only error or injustice in his record, so far as the Correction Board was concerned, was the absence of secretarial approval of the 1950 Physical Evaluation Board findings and recommendations that plaintiff had been permanently disabled as a result of active service and should be retired for physical disability with pay. When plaintiff's case was considered by the Correction Board in 1954, we think that Board was without authority to review and reverse the findings and conclusions of the 1950 Physical Evaluation Board which, as shown, were entirely and unanimously in plaintiff's favor. The Correction Board was certainly without authority to do this in the absence of any additional strong and convincing evidence pointing to a contrary result adverse to plaintiff.

 The Correction Board did not have any medical evidence other than that which was before the Physical Evaluation Board and it did not order any further medical examinations of plaintiff and did not seek the opinion of any other medical board, even if, in the circumstances, it had authority to do so. It considered the case entirely upon the basis of the record made before the Physical Evaluation (Retiring) Board, plus some testimony by the plaintiff which was merely cumulative and which supported the prior findings and conclusions of the Physical Evaluation Board. It was within the power of the Correction Board to recommend to the Secretary of the Air Force that he do what he (mistakenly) thought he could not otherwise legally do, i. e., approve the findings and conclusions of his 1950 Physical Evaluation Board and place plaintiff on the disability retired list with pay from February 10, 1947. Such action by the Correction Board and the Secretary would have corrected the only error and injustice in plaintiff's record. But with-

out any additional evidence, and solely on the basis of an unauthorized and unofficial legal opinion rendered by a non-medical official, the Correction Board undertook to correct plaintiff's record adversely to the plaintiff by overruling the 1950 Physical Evaluation Board's findings and decision that plaintiff was 30% permanently disabled and therefore entitled to disability retirement with pay. We are of the opinion that, under the facts and circumstances of this case, the Correction Board exceeded its authority and acted arbitrarily and contrary to law.

As pointed out earlier herein, defendant contends that in any event plaintiff's claim is barred by the six-year statute of limitations. It is defendant's position that plaintiff's claim first accrued on February 10, 1947, when plaintiff was released to inactive duty "not by reason of physical disability" and without retirement pay pursuant to the determination of the Army Retiring Board, and that even the arbitrary denial of plaintiff's claim for relief by the Correction Board in 1954 did not give rise to a new and independent cause of action. Under the circumstances in this case, the action of the Army Retiring Board in 1946, recommending that plaintiff be reexamined at a later date and reevaluated for possible disability retirement with pay, *was not a final decision* as to his right to disability retirement with pay. It is true that plaintiff asked to be relieved from active duty rather than to continue on limited active duty pending such reevaluation of his case, but this election was offered to plaintiff by the Air Force with the understanding that if he was released from active duty, he would not forfeit his right to a later final reevaluation and determination of his right to disability retirement with pay. It is also true that plaintiff did not, when offered an opportunity, appear before the Retiring Board in Tilton General Hospital in 1947. However, it seems obvious that the Air Force did not feel that under all the circumstances plaintiff had forfeited his right to a reevaluation of his case by not remaining in the hospital in 1947 because when plaintiff requested Correction Board action in 1949, the Air Force treated his application as one for a reevaluation of his disability retirement eligibility by a *Retiring Board*. That Retiring Board (Physical Evaluation Board) considered plaintiff's case and rendered findings and conclusions favorable to plaintiff's claim in 1950, and if the Air Force had not been under a misapprehension as to the requirements of the 1949 Career Compensation Act, the recommendations of the Physical Evaluation Board (Retiring Board) would undoubtedly have been approved by the Secretary of the Air Force and plaintiff would have been retired with disability retired pay. Updike v. United States, supra. It therefore appears that through a misapprehension as to the effect of the Career Compensation Act on plaintiff's right to disability retirement, plaintiff's claim was for the first time at least informally denied on December 3, 1952 (finding 18). Accordingly, if his cause of action accrued on the occasion when his claim for disability retirement was thus denied in 1952 by the Air Force, that event took place well within six years prior to the filing of his petition on March 29, 1955.

In a number of recent decisions by this court it has been held that a cause of action for disability retired pay accrues when the Secretary or a Correction Board arbitrarily, capriciously and contrary to law denies such application. San Millan v. United States, Ct.Cl., 153 F.Supp. 370; Furlong v. United States, Ct.Cl., 152 F.Supp. 238; Proper v. United States, Ct.Cl., 154 F.Supp. 317. This event in plaintiff's case took place in 1954. We are of the opinion that whether plaintiff's cause of action accrued in 1952 when the Air Force erroneously failed to retire him according to the findings and recommendation of the Physical Evaluation Board, or in 1954 when the Correction Board denied his application, his claim is not barred by the statute of limitations.

Finally, defendant contends that this court has no jurisdiction to review an

adverse decision by a Board for the Correction of Military Records. This court has held that it does have jurisdiction. Furlong v. United States, supra; San Millan v. United States, supra; Proper v. United States, supra. Defendant urges, however, that this court has not considered the legislative history of the Correction Board statute, which, defendant contends, indicates that Congress intended the Correction Boards to have exclusive jurisdiction of all matters brought before them. In our opinion, the language of section 207 of the Legislative Reorganization Act of 1946, as amended, 65 Stat. 655,[2] does not lend any support to the Government's contention. Section 207(a) provides that corrections made by the Boards shall be final and conclusive on *all officers of the Government* except when procured by means of fraud. Such language does not, in our opinion, render the corrections final and conclusive on courts of the United States, and the legislative history of the 1951 Act indicates (1) that Congress knew how to enact language which would have produced such finality if Congress had wished it, and (2) that Congress considered granting such finality to Correction Board action and decided to withhold such finality.

When H. R. 1181 was referred to the House Armed Services Committee in 1951 and hearings held thereon, section 207(a) contained no provision according finality to any corrective action rendered by the Board. Section 207(c) contained a provision that any monetary settlement arrived at as a result of the correction rendered under 207(a) should be "final and conclusive on all officers of the Government, *including review by the courts of the United States*, except where procured by means of fraud." [Italics supplied.]

In the course of the hearings, a witness from the General Accounting Office testified that his agency objected to the quoted language in 207(c) which deprived the General Accounting Office of its usual power to review monetary settlements made by Government agencies. The witness from the Department of Defense testified that his agency did not want *any other government agency* to have the right to review the *merits* of a correction board decision. The General Accounting Office witness assured the committee that General Accounting Office had no interest in reviewing the merits of a correction decision, but merely wished to retain its normal authority to pass on the computation of any administrative payment made under such a correction. At this point, Representative Clemente noted that in the discussion the witnesses were referring only to the office of the Comptroller General whereas the language of section 207(c) also excluded *court review*. The witness from the Department of Defense testified that a claimant could either ask the Board to review its own decision for error in denying the application for correction, or the claimant could go to Congress for relief if the Board refused to act. Representative Doyle asked whether there was much chance of a claimant's getting a private bill through Congress "if there is a final hearing by the Board and the Board says No?" The witness from the Department of Defense answered in the negative and the Committee concluded that claimants should not be barred from court appeal. Thereafter, the words in 207(c)—"including review by the courts of the United States"—was eliminated first, and later, all language of finality was omitted from 207(c) leaving the administrative *payment* of claim open to review by both General Accounting Office and by the courts.

At the same time, there was inserted in 207(a) for the first time, language giving *some* finality to decisions of the Correction Board as follows: "and corrections so made shall be final and conclusive on all officers of the Government except when procured by means of fraud." In view of the testimony at the hearing, it seems quite clear that this language was intended to render the cor-

**2.** Now 10 U.S.C.A. § 1552.

rection decision final as to other Government agencies in general and the General Accounting Office in particular, but that Congress did not intend that such correction decisions would be immune to "review by the courts of the United States".

It is true, as noted by defendant, that the discussion at the hearings relative to finality and court review, took place in connection with the finality language contained in section 207(c) dealing with the administrative payment (settlement) of claims where a record had already been corrected under section 207(a). However, a reading of the entire testimony indicates to us that the discussion was not confined to the desirability of having a court review of the monetary settlement only, but also the desirability of having a court review of the merits of the Board's decision on the application for correction. Furthermore, if Congress had wished to make the correction decision final and nonreviewable by the courts, it would have been a simple matter to have included in section 207(a) the language originally found in section 207(c) and later omitted therefrom, i. e., "including review by the courts of the United States."

Defendant suggests that in enacting the correction board legislation, the only intention of Congress was to replace the vehicle of the private bill process by secretarially approved correction board action. It is true that in certain areas and under certain circumstances, the courts were powerless to grant relief from some types of executive action in connection with military service records, where there had been errors and injustices against military personnel. But this was not the only purpose of the Act. The line of cases to which defendant has reference involved petitions for certiorari to the courts of the District of Columbia to review proceedings of military boards and to annul presidential orders; petitions for mandamus to annul secretarial actions and compel other actions, mandatory injunctions, and the like. Un-

der the correction board legislation, that board was given power to act in those areas. On the other hand, the sort of "review" contemplated in an action to recover lost pay in the Court of Claims is an original suit for a money judgment and not a review looking to the alteration or correction of an official military record or to the compelling of official action by an officer of an executive department. And such "reviews" by this court to determine whether or not pay has illegally been withheld from a member or former member of the military services, have long been sanctioned by this court and the Supreme Court. Reynolds v. United States, 292 U.S. 443, 54 S.Ct. 800, 78 L.Ed. 1353; Spencer v. United States, 102 F.Supp. 774, 121 Ct.Cl. 558, certiorari denied 344 U.S. 828, 73 S.Ct. 29, 97 L.Ed. 644; Shapiro v. United States, 69 F.Supp. 205, 107 Ct.Cl. 650; Dismuke v. United States, 297 U.S. 167, 56 S.Ct. 400, 80 L.Ed. 561.

We conclude that Congress had no intention, in enacting the correction board legislation, of withholding from this court jurisdiction to render a money judgment for pay of which a claimant is deprived by reason of the arbitrary or illegal action of a correction board in either wrongfully refusing to correct the record, or wrongfully refusing to order payment of amounts due on account of a proper correction made by the board. Prince v. United States, 119 F.Supp. 421, 127 Ct.Cl. 612. The rendering of a money judgment and the necessary but incidental type of "review" involved therein, does not have the effect of changing an official record or of compelling executive action.

Plaintiff has stated and proved a claim for disability retired pay which is not barred by the statute of limitations and is within the jurisdiction of this court. Plaintiff is entitled to recover disability retired pay from February 10, 1947, to date of judgment herein and judgment will be entered in accordance with this opinion. The amount of recovery will

be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

REED, Justice (ret.), sitting by designation; JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.