Gabriel J. MARTINEZ, Plaintiff–
Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 99–5163.

United States Court of Appeals,
Federal Circuit.

DECIDED: June 17, 2003.

Charles W. Gittins, Law Offices of Charles W. Gittins, P.C, of Middletown, VA, argued for plaintiff-appellant.

James M. Kinsella, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief was David M. Cohen, Director. Of counsel on the brief were Tara A. Osborn, LTC, and James R. Agar II, Major, Army Litigation Division, United States Army, of Arlington, Virginia. Of counsel were Aileen M. Bell, Joseph Trautwein, and Opher Shweiki, Attorneys, Department of Justice, of Washington, DC. Also of counsel was Captain David E. Mendelson, Army Litigation Division, United States Army, of Arlington, Virginia.

Before MAYER, Chief Judge, NEWMAN, MICHEL, Circuit Judges, PLAGER, Senior Circuit Judge, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge BRYSON, in which Circuit Judges MICHEL, LOURIE, CLEVENGER, RADER, SCHALL, and PROST join; and in which Circuit Judges PAULINE NEWMAN, LINN, and DYK join with respect to PARTS I, II, III, V, and VI.

Dissenting opinion filed by Senior Circuit Judge PLAGER, in which Chief Judge MAYER and Circuit Judges PAULINE NEWMAN, GAJARSA, LINN, and DYK join.

BRYSON, Circuit Judge.

We took this case en banc to address the question whether to overrule our decision in *Hurick v. Lehman*, 782 F.2d 984 (Fed. Cir.1986), regarding the calculation of the limitations period for military discharge cases brought in the Court of Federal Claims. After careful consideration, we conclude that *Hurick* should not be overruled, and we affirm the judgment of the Court of Federal Claims.

I

Gabriel J. Martinez was commissioned as an officer in the United States Army Reserve in October 1980. In 1984 he joined the Active Guard Reserve Program and continued on active duty with that program until 1992, attaining the rank of captain.

In 1991, while Captain Martinez was still on active duty, a proceeding was brought against him under Article 15 of the Uniform Code of Military Justice, 10 U.S.C. § 815, on charges of fraternization, adultery, communicating a threat, and impeding a witness. An Article 15 proceeding is an informal proceeding in which only limited penalties may be imposed upon a finding of guilt. It takes place before a command officer, unlike a court-martial, which is held before a military court.

The charges stemmed from an allegation that Captain Martinez had had an affair with a female sergeant between April and July 1991. The person making the allegation, the sergeant's husband, stated that Captain Martinez had threatened to kill him if he reported the affair to military authorities. Captain Martinez denied the charges and asserted that the husband had fabricated the story about the affair and the threat in order to help Captain Martinez's ex-wife in a custody fight.

On August 9, 1991, at the conclusion of the Article 15 proceeding, Captain Martinez was found guilty of the charges against him and was ordered to forfeit two months' pay. Captain Martinez appealed from the Article 15 determination, but the appeal was denied. On February 25, 1992, based on the outcome of the Article 15 proceeding, Captain Martinez was separated from active duty and transferred to the Army Reserve Control Group. Although his "character of service" was listed as "honorable," the reason for his separation was identified as "misconduct."

In 1994, an Officer Elimination Board convened to consider whether Captain Martinez should be discharged from the United States Army Reserve. The Board considered evidence from Captain Martinez and other witnesses. The evidence included a sworn statement from Captain Martinez's ex-wife, in which she stated that the sergeant's husband had sought to have Captain Martinez disciplined by the Army in order to assist her in her custody battle with Captain Martinez. She also stated that the sergeant's husband had admitted to her that his allegations about the affair between his wife and Captain Martinez were false. After hearing that evidence, the Officer Elimination Board concluded that the charges against Captain Martinez that formed the basis for the Article 15 proceeding were not true. The

Board therefore recommended that he be retained as a reserve officer. The Article 15 proceeding remained a part of his military record, however, and later that year he was notified that he was not selected for promotion to major.

In March 1995, Captain Martinez filed an application with the Army Board for Correction of Military Records ("the Correction Board") asking that the Article 15 proceeding be expunged from his military record, that his discharge from active duty be voided, that he be restored to active duty without a break in service, that he be promoted retroactively to major, and that he be awarded the pay he would have received during the period after his discharge. He also requested Correction Board review of an earlier disciplinary letter in his file unrelated to the subject of the Article 15 proceedings.

On August 23, 1995, the Correction Board denied Captain Martinez's application. The Correction Board declined to give any weight to the Officer Elimination Board's conclusion that Captain Martinez had not committed the alleged misconduct that was the subject of the Article 15 proceeding. The Correction Board concluded instead that it was likely that Captain Martinez had committed the acts that were the subject of the Article 15 proceeding and that Mrs. Martinez's sworn statement to the contrary was "unconvincing," because "she probably has a vested interest in the continuation of [Captain Martinez's] career."

Captain Martinez sought reconsideration of the Correction Board's decision, but the Correction Board denied that request on March 26, 1997. In the meantime, Captain Martinez was passed over a second time for promotion to major and accordingly was separated from the United States Army Reserve on March 25, 1997.

On August 17, 1998, Captain (now Mr.) Martinez filed a complaint in the Court of Federal Claims alleging that the Correction Board's decision was arbitrary and capricious, constituted an abuse of discretion, was not supported by substantial evidence, and failed to comply with the Correction Board's statutory mandate. By way of relief, the complaint asked the court for an order correcting his letter of reprimand and his Article 15 punishment from his military record and removing any reference to "misconduct" as the reason for his separation from active duty; reinstating him to active duty in the United States Army Reserve with the rank of captain; directing the Army to place his corrected military record before a special selection board to consider him for promotion to the rank of major without taking into account the Article 15 information in his record; requiring the Army to return the two months' pay he forfeited in the Article 15 proceeding; and awarding him back pay from the date of his separation from active duty in February 1992.

The Court of Federal Claims dismissed the complaint as time-barred. *Martinez v. United States*, No. 98–662C (Fed.Cl. Aug. 9, 1999). Because Mr. Martinez had filed his complaint more than six years after February 25, 1992, the date of his separation from active duty, the court held that it did not have jurisdiction over his case in light of the six-year statute of limitations for claims against the government brought in the Court of Federal Claims. *See* 28 U.S.C. § 2501. The court explained that "[a] claim based on unlawful discharge or release from military service accrues on the date of discharge or release because that is the date the injury—i.e., the loss of pay—is incurred." *Martinez*, slip op. at 8. Thus, the court ruled that Mr. Martinez's claim for reinstatement to active duty, back pay, and other ancillary relief accrued on February 25, 1992. The claim

for forfeited pay accrued on August 9, 1991, the court ruled, because that was the date on which the pay was forfeited as a result of the Article 15 proceeding, and thus was the date on which the injury incurred. *Id.*

The court rejected what it referred to as Mr. Martinez's "attempt to avoid the statute of limitations by characterizing this action as a challenge to the [Correction Board's] decisions rather than the propriety of the disciplinary actions taken against him or his release from active duty." *Martinez,* slip op. at 9. Citing this court's decision in *Hurick v. Lehman,* 782 F.2d 984 (Fed.Cir.1986), the court explained that the failure of a civilian correction board to set aside a military discharge does not give rise to a separate and independent claim, because the correction board's action is "merely ancillary to the discharge that the former serviceman is seeking to change." *Martinez,* slip op. at 9 (quoting *Hurick,* 782 F.2d at 987). The court noted that resort to a correction board is not a mandatory prerequisite to challenging the discharge in the Court of Federal Claims, and that the statute of limitations "is not tolled by resort to optional administrative remedies, such as an appeal to a military records correction board." *Id.*

Finally, the trial court rejected Mr. Martinez's argument that the statute of limitations should be tolled until November 4, 1993, when Mrs. Martinez issued her sworn statement that gave rise to his claim that his Article 15 punishment was improper. The court explained that the statute of limitations for an action in the Court of Federal Claims is tolled only if the plaintiff shows that the defendant has concealed the facts giving rise to the cause of action, preventing the plaintiff from learning of those facts, or if the injury was inherently unknowable as of the accrual date. In this case, the court held, there was no evidence that the government had been guilty of any concealment, and the injury in question was plain to Mr. Martinez as of February 25, 1992, when he was released from active duty. *Martinez,* slip op. at 10.

Mr. Martinez appealed the dismissal order to this court. Before the panel, Mr. Martinez acknowledged that the principal issues in the case were controlled by this court's decision in *Hurick v. Lehman,* and that if the panel followed *Hurick* it would have to conclude that his cause of action accrued as of the date of his discharge from active duty and that the running of the limitations period was not tolled by his application to the Correction Board. Mr. Martinez therefore urged the court to reconsider *Hurick.* After oral argument before the panel, the full court granted en banc review, ordered the parties to file new briefs, and invited the parties to address the question whether *Hurick* should be overruled. We now reaffirm *Hurick v. Lehman,* and we affirm the order of the trial court dismissing the complaint as time-barred.

II

As the parties acknowledge, the facts of the *Hurick* case closely parallel the facts of this case in all material respects. Mr. Hurick was discharged from the Navy for unsuitability. He twice sought relief from the Board for the Correction of Naval Records, challenging his discharge as unlawful. The Board denied relief. Following the Correction Board's second ruling, and seven years after his discharge, Mr. Hurick filed an action in district court based in part on the "Little Tucker Act," 28 U.S.C. § 1346(a)(2). The district court held that the six-year statute of limitations for suits against the United States barred the action, and this court affirmed.

Like Mr. Martinez, Mr. Hurick sought both reinstatement and an award of the pay he lost as a result of his discharge. Based on a long line of decisions from this court and its predecessor, the Court of Claims, this court held that Mr. Hurick's claim accrued as of the date of his discharge. *Hurick*, 782 F.2d at 986. Accordingly, the statute of limitations ran from that date and expired six years later. The court rejected Mr. Hurick's argument that the statute of limitations was tolled for the period in which his applications for relief were pending before the Board for the Correction of Naval Records ("BCNR"). The court explained that resort to the BCNR was a permissive remedy, not a mandatory precondition to filing suit. Accordingly, the court held that the proceedings before the BCNR did not suspend the running of the limitations period. *Id.* at 987. With respect to Mr. Hurick's argument that he was not challenging his original discharge, but was challenging only the refusal of the BCNR to give him relief from the discharge, the court held that the failure of the BCNR to set aside a military discharge "does not give rise to a separate and independent claim, since that action is merely ancillary to the discharge that the former serviceman is seeking to change." *Id.*

## III

Mr. Martinez acknowledges that his action under the Tucker Act, 28 U.S.C. § 1491, was subject to the six-year statute of limitations set forth in 28 U.S.C. § 2501.[1] He also acknowledges, as he must, that his complaint in the Court of

Federal Claims was not filed within six years of his discharge from active duty. He makes three arguments as to why the six-year limitations period does not bar his action. First, he contends that a service member challenging a discharge from active duty is required to exhaust all available administrative remedies in a correction board before filing a Tucker Act claim. For that reason, he argues, the six-year statute of limitations did not begin to run until the date of the Correction Board's decision in his case. Second, he contends that a second cause of action accrued at the time of the Correction Board decision and that the statute of limitations on that cause of action began to run at that time. Third, he argues that, even if his sole cause of action accrued when he was separated from active duty, the running of the statute of limitations was equitably tolled until his ex-wife made the written statement supporting his contention that the charges against him were fabricated. We address the first argument in this Part of our opinion and the other two arguments in Parts IV and V.

## A

 The Tucker Act authorizes certain actions for monetary relief against the United States to be brought in the Court of Federal Claims. The actions for which the Tucker Act waives sovereign immunity are actions pursuant to contracts with the United States, actions to recover illegal exactions of money by the United States, and actions brought pursuant to money-mandating constitutional provisions, stat-

---

1. Section 2501 provides, in pertinent part: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The general statute of limitations for suits against the United States, 28 U.S.C. § 2401, has almost identical language: "Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

utes, regulations, or executive orders. *See United States v. Navajo Nation,* 537 U.S. 488, 123 S.Ct. 1079, 1089, 155 L.Ed.2d 60 (2003); *United States v. Mitchell,* 463 U.S. 206, 212–18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Tippett v. United States,* 185 F.3d 1250, 1254–55 (Fed.Cir. 1999). The Tucker Act does not itself provide the substantive cause of action; instead, a plaintiff must look elsewhere for the source of substantive law on which to base a Tucker Act suit against the United States. *Testan,* 424 U.S. at 398, 96 S.Ct. 948; *Collins v. United States,* 67 F.3d 284, 286 (Fed.Cir.1995). In the context of military discharge cases, the applicable "money-mandating" statute that is generally invoked is the Military Pay Act, 37 U.S.C. § 204. In order to bring a military discharge case in the Court of Federal Claims, a plaintiff therefore must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge.

Although the Court of Federal Claims does not have general equity jurisdiction, the Tucker Act provides that in cases based on actions for monetary relief, the court may issue such orders as are necessary "[t]o provide an entire remedy and to complete the relief afforded by the judgment," including "as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." 28 U.S.C. § 1491(a)(2).

**B**

A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, *i.e.,* when "all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." *Nager Elec. Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847, 851 (1966); *see Catawba Indian Tribe of S.C. v. United States,* 982 F.2d 1564, 1570 (Fed. Cir.1993); *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988). In a military discharge case, this court and the Court of Claims have long held that the plaintiff's cause of action for back pay accrues at the time of the plaintiff's discharge. *See Bowen v. United States,* 292 F.3d 1383, 1386 (Fed. Cir.2002); *Real v. United States,* 906 F.2d 1557, 1560 (Fed.Cir.1990); *Williams v. Sec'y of the Navy,* 787 F.2d 552, 562 n. 15 (Fed.Cir.1986); *Bray v. United States,* 785 F.2d 989, 994 (Fed.Cir.1986); *Bonen v. United States,* 229 Ct.Cl. 144, 666 F.2d 536, 539 (1981).[2] The service member therefore has the right to sue immediately upon discharge for the funds improperly being withheld. Moreover, the courts have made clear that a Tucker Act claim for back pay accrues all at once at the time of discharge; the claim for back pay is not a "continuing claim" that accrues each time a payment would be due throughout the period that the service member would have remained on active duty. *See Longhine v. United States,* 230 Ct.Cl. 920, 922 (1982); *Vincin v. United States,* 199 Ct.Cl. 762, 468 F.2d 930, 933 (1972); *Mathis v. United States,* 183 Ct.Cl. 145, 391 F.2d

---

**2.** Other courts have also held that a cause of action for unlawful discharge accrues at the time of discharge. *See Geyen v. Marsh,* 775 F.2d 1303, 1308 (5th Cir.1985); *Walters v.* *Sec'y of Defense,* 725 F.2d 107, 114 (D.C.Cir. 1983); *Nichols v. Hughes,* 721 F.2d 657, 659 (9th Cir.1983); *Ballenger v. Marsh,* 708 F.2d 349, 350 (8th Cir.1983).

938, 939 (1968). If the plaintiff does not file suit within the six-year limitation period prescribed in 28 U.S.C. § 2501, the plaintiff loses all rights to sue for the loss of pay stemming from the challenged discharge. That is, the claim accrues "at one time, once and for all," on the date of discharge, even though the asserted obligation to pay the plaintiff, on which the claim is based, continues until the end of the plaintiff's enlistment. *Mathis*, 391 F.2d at 939.

■ This court and the Court of Claims have frequently addressed and rejected the argument that the cause of action for unlawful discharge does not accrue until the service member seeks relief from a correction board and the correction board enters a final decision denying relief. *Hurick*, 782 F.2d at 987; *Heisig v. United States*, 719 F.2d 1153, 1155 (Fed.Cir.1983); *Bonen*, 666 F.2d at 539; *Eurell v. United States*, 215 Ct.Cl. 273, 566 F.2d 1146, 1148 (1977); *Homcy v. United States*, 210 Ct.Cl. 332, 536 F.2d 360, 363 (1976); *Kirby v. United States*, 201 Ct.Cl. 527, 531 (1973); *Mathis*, 391 F.2d at 939; *Friedman v. United States*, 159 Ct.Cl. 1, 310 F.2d 381, 396 (1962); *Lipp v. United States*, 157 Ct.Cl. 197, 301 F.2d 674, 675 (1962). The reasoning underlying that line of cases is that, since their creation, the correction boards have been regarded as a permissive administrative remedy and that an application to a correction board is therefore not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge. *Richey v. United States*, 322 F.3d 1317, 1325 (Fed.Cir.2003); *Heisig*, 719 F.2d at 1155 ("[A]lthough relief has usually been first sought from military correction boards since their creation in 1946, there is here no requirement of exhaustion of administrative remedies prior to pursuit of judicial review."). Accordingly, the failure to seek relief from a correction board not

only does not prevent the plaintiff from suing immediately, but also does not prevent the cause of action from accruing.

■ The cases involving the effect of the availability of a correction board remedy on the statute of limitations are simply special applications of a broader principle of administrative law. As a general matter, if a dispute is subject to mandatory administrative proceedings, the plaintiff's claim does not accrue until the conclusion of those proceedings. *Crown Coat Front Co. v. United States*, 386 U.S. 503, 511, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967); *Lins v. United States*, 231 Ct.Cl. 579, 688 F.2d 784, 786 (1982); *Nager Elec.*, 368 F.2d at 853. On the other hand, this court and the Court of Claims have long held that, in Tucker Act suits, a plaintiff is not required to exhaust a permissive administrative remedy before bringing suit. As a corollary of that rule, the court has held that a plaintiff's invocation of a permissive administrative remedy does not prevent the accrual of the plaintiff's cause of action, nor does it toll the statute of limitations pending the exhaustion of that administrative remedy. *See Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed.Cir. 1995); *Lins*, 688 F.2d at 788; *Camacho v. United States*, 204 Ct.Cl. 248, 494 F.2d 1363, 1369 (1974); *Iran Nat'l Airlines Corp. v. United States*, 175 Ct.Cl. 504, 360 F.2d 640, 642 (1966); *Steel Improvement & Forge Co. v. United States*, 174 Ct.Cl. 24, 355 F.2d 627, 630–31 (1966); *Lipp*, 301 F.2d at 675–76 (citing numerous cases); *Empire Inst. of Tailoring, Inc. v. United States*, 142 Ct.Cl. 165, 168, 161 F.Supp. 409 (1958); *Love v. United States*, 122 Ct.Cl. 144, 146, 104 F.Supp. 102 (1952); *Nitro Chem. Corp. v. United States*, 71 Ct.Cl. 453, 457 (1931); *Battelle v. United States*, 7 Ct.Cl. 297, 300–01 (1871).

Without contesting this general rule as applied in other types of Tucker Act suits,

Mr. Martinez invites us to overrule all of our prior decisions holding that resort to a correction board is permissive, not mandatory, and to announce a new rule that a service member's cause of action challenging his discharge in the Court of Federal Claims does not accrue until after the service member has exhausted all administrative remedies before a correction board. For the reasons set forth below, we decline that invitation.

### C

■ The Supreme Court has noted that congressional intent is of "paramount importance" to any exhaustion inquiry. *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *see also Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *Darby v. Cisneros*, 509 U.S. 137, 144–45, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). When Congress expressly requires exhaustion of administrative remedies before suit is brought, exhaustion is, of course, mandatory. When Congress has not spoken directly to the issue, "appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme." *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

The Supreme Court applied that principle in *Darby v. Cisneros* and held that in light of section 10(c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, courts may not require exhaustion of administrative remedies upon appeal from final agency action, except where exhaustion is expressly required by statute or rule. Although section 10(c) had often been overlooked in the past, the Court concluded that it was clear that Congress "explicitly require[d] exhaustion of all intra-agency appeals mandated either by statute or by agency rule," but that "it would be inconsistent with the plain language of § 10(c) for courts to require litigants to exhaust optional appeals as well." *Darby*, 509 U.S. at 147, 113 S.Ct. 2539.

The Supreme Court has reached the same conclusion with respect to actions brought under 42 U.S.C. § 1983, the general federal civil rights statute. The Court held that the Congress that enacted that statute did not intend to require plaintiffs to exhaust state remedies before seeking to vindicate their constitutional rights in federal court. Accordingly, the Court rejected the argument that courts could require exhaustion of administrative remedies as a matter of judicial discretion in cases in which exhaustion would seem to serve a useful purpose. *See Patsy*, 457 U.S. at 502–07, 102 S.Ct. 2557.

The Supreme Court has employed the same reasoning, and reached the same result, in rejecting arguments that Tucker Act plaintiffs may be required to exhaust their administrative remedies before filing suit on their claims. Such a requirement, the Court has held, would be inconsistent with the statutory provision defining the rights of Tucker Act claimants and with the statute of limitations for bringing Tucker Act suits.

In *Clyde v. United States*, 5 Ct.Cl. 134 (1869), the then-young Court of Claims had promulgated a rule of practice requiring all claimants who filed actions under the predecessor to the Tucker Act to seek relief first from the executive department in question before prosecuting claims before the court. In an opinion occupying less than one page, the Supreme Court made short work of that rule. *Clyde v. United States*, 13 Wall. 38, 80 U.S. 38, 20 L.Ed. 479 (1871). The Court explained

that the rule "was really an additional restriction to the exercise of jurisdiction by [the Court of Claims]. It required the claimant to do what the acts giving the court jurisdiction did not require him to do before it would assume jurisdiction of his case." *Id.* at 39. To require such a step was a matter for Congress, not for the Court of Claims, the Supreme Court held. By imposing an exhaustion requirement that was not prescribed by statute, the Court explained, the Court of Claims "was establishing a jurisdictional requirement which Congress alone had the power to establish." *Id.*

More recently, in *Soriano v. United States,* 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957), the Supreme Court reached the same conclusion, using reasoning that is directly applicable to the present case. In *Soriano* the plaintiff was seeking just compensation for material requisitioned by the Philippine guerrilla forces during World War II. The plaintiff argued that he was required to exhaust his available administrative remedies by requesting and obtaining a ruling on his claim by the Army Claims Service as a prerequisite to filing a Tucker Act suit in the Court of Claims. In that case, as in this one, it was in the plaintiff's interest to argue that the exhaustion of administrative remedies was required, because otherwise the six-year statute of limitations for Tucker Act suits would have expired prior to his filing in the Court of Claims.

The Supreme Court rejected the plaintiff's argument based on the language of the Tucker Act. The Court held that the Tucker Act strictly defined the class of cases in which Congress consented to suit against the sovereign and that courts were not empowered to engraft additional limitations on the Court of Claims' exercise of its jurisdiction. The "limitations and conditions upon which the Government con-

sents to be sued must be strictly observed, and exceptions thereto are not to be implied." *Soriano,* 352 U.S. at 276, 77 S.Ct. 269. In the course of its discussion, the *Soriano* Court referred with approval to a line of Court of Claims cases that had held, in various factual settings, that the running of the six-year statute of limitations for Tucker Act claims was not tolled during the period that the claims were under consideration by various administrative agencies. *Id.* at 275 n. 6, 77 S.Ct. 269.

The same analysis, as applied to this case, leads to the same conclusion: that Congress did not authorize postponement of the running of the limitations period while optional administrative remedies were being exhausted. Of course, if Congress had made clear that service members had to exhaust their remedies in the correction boards before filing suit under the Tucker Act, the statute of limitations for the Tucker Act suit would not begin to run until the correction board process was completed. We find no indication of any such congressional intention, however. In fact, as we discuss below, the historical evidence supports this court's consistent interpretation of the correction board legislation as creating a permissive avenue for collateral administrative relief, not a mandatory prerequisite to suit.

D

The correction boards were first created as a result of a 1946 statute that authorized the Secretary of War, the Secretary of the Navy, and the Secretary of the Treasury (who had jurisdiction over the Coast Guard at that time) to set up boards of civilian review "to correct any military or naval record where in their judgment such action is necessary to correct an error or to remove an injustice." Legislative Reorganization Act of 1946, Pub. L. No. 79–601, § 207, 60 Stat. 812, 837. The cor-

rection boards were created to relieve Congress of the burden of considering private bills to correct alleged errors and injustices in the military system, as evidenced by the fact that in the same statute that authorized the creation of the correction boards, Congress enacted a provision stating that no private bill or resolution authorizing the correction of military or naval records would be received or considered by either house of Congress. *Id.* § 131, 60 Stat. 831; *see also* S.Rep. No. 82–923, 82d Cong., 1st Sess. (1951), *reprinted in* 1951 U.S.C.C.A.N. 2469; 40 Op. Att'y Gen. 504, 505 (1947). In 1951, Congress elaborated on that statutory provision by requiring that requests for corrective action ordinarily be filed within three years of the discovery of the alleged error or injustice, and authorizing the respective Departments to make payments to claimants when such payments were found to be due as a result of correction board action. Pub. L. No. 82–220, 65 Stat. 655 (1951).

Prior to the enactment of the correction board legislation, the Court of Claims had addressed monetary claims by service members that fell within the scope of the Tucker Act, and at the same time Congress had addressed claims by service members—monetary as well as nonmonetary—through private bills. There was, of course, no suggestion that before filing a Tucker Act suit a service member had to apply for and be denied the benefit of a private bill. When Congress authorized the creation of correction boards to take the place of private bills for service members, it did not suggest that service members would be barred from obtaining relief under the Tucker Act until and unless they had sought relief from the pertinent correction board. Contemporaneous Tucker Act cases regularly held that exhaustion of administrative remedies was not required unless Congress, the agency in question, or the contract in suit, expressly compelled

it. *See L.E. Myers Co. v. United States,* 105 Ct.Cl. 459, 478, 64 F.Supp. 148 (1946); *Ylagan v. United States,* 101 Ct.Cl. 294 (1944); *John P. Moriarty, Inc. v. United States,* 97 Ct.Cl. 338 (1942); *Pink v. United States,* 85 Ct.Cl. 121, 124 (1937); *Cohen, Goldman & Co. v. United States,* 77 Ct.Cl. 713, 730 (1933). In light of the well-settled state of Tucker Act jurisprudence at the time, as well as the absence of any suggestion that the new remedy would be mandatory rather than permissive, we decline to attribute any such intention to Congress or to read the correction board legislation as imposing any mandatory exhaustion requirement *sub silentio.*

Several years after the enactment of the correction board legislation, a question arose whether a service member challenging a discharge action was required to exhaust administrative remedies in a correction board before seeking judicial relief. In *Ogden v. Zuckert,* 298 F.2d 312 (D.C.Cir.1961), the Court of Appeals for the District of Columbia Circuit answered that question in the negative, holding that a service member could bring a court challenge to military action even though he had not first sought relief from the pertinent correction board. The court explained that when Congress created the correction boards, there was

> no indication of congressional consciousness or intention that judicial jurisdiction would be affected. . . . The congressional plan is for the Boards to assist the Secretaries in correcting errors and injustices in military records. This plan was not designed to bring the Boards into the original administrative process of making the records, a process which is participated in by the various other boards . . . which considered and reviewed plaintiff's case before the Secretary acted.

The Board furnishes a means by which to seek correction of error or injustice, but neither statute nor regulation requires this means to be pursued as a condition to finality of the Secretary's action. The relief which might ensue after Board consideration, similar to relief previously obtained by private bills enacted by Congress, is through a procedure over and above that which guides the administrative process itself to its end.

*Id.* at 314–15. As we have noted, the Court of Claims reached the same result in a long line of cases, including a thorough treatment of the issue by Judge Davis in *Friedman v. United States*, 159 Ct.Cl. 1, 310 F.2d 381 (1962).

### E

Mr. Martinez points out that some courts of appeals have required plaintiffs ordinarily to exhaust their administrative remedies in the correction boards before filing actions seeking equitable relief against the military. *See, e.g., Guerra v. Scruggs*, 942 F.2d 270 (4th Cir.1991); *Linfors v. United States*, 673 F.2d 332, 333–34 (11th Cir.1982); *Diliberti v. Brown*, 583 F.2d 950, 951 (7th Cir.1978); *Hodges v. Callaway*, 499 F.2d 417 (5th Cir.1974). Other courts have taken a different approach, authorizing district courts to assume jurisdiction over such military claims, but ruling in particular cases that district courts should stay judicial proceedings until the applicable correction board remedies have been exhausted. *See, e.g., Montgomery v. Rumsfeld*, 572 F.2d 250, 252–55 (9th Cir.1978) ("competing interests can best be accommodated if the court requires the exhaustion of remedies, but retains jurisdiction of the matter"); *Sohm v. Fowler*, 365 F.2d 915 (D.C.Cir.1966) (district court not required to dismiss suit while correction board proceeding was

pending); *Nelson v. Miller*, 373 F.2d 474 (3d Cir.1967).

The plaintiffs in the court of appeals cases on which Mr. Martinez relies sought equitable relief, not monetary relief under the Tucker Act. The courts therefore did not have to address the question whether imposing an exhaustion requirement would be inconsistent with the language of the Tucker Act and its statute of limitations, as well as the Supreme Court decisions regarding exhaustion under the Tucker Act, such as *Soriano*. Moreover, it is unclear whether the court of appeals decisions on which Mr. Martinez relies have survived the Supreme Court's decision in *Darby v. Cisneros*, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), which restricted judicial discretion to impose exhaustion requirements in agency review cases arising under the Administrative Procedure Act. *See Daugherty v. United States*, 212 F.Supp.2d 1279 (N.D.Okla. 2002) (holding that *Darby* is inconsistent with requiring exhaustion of correction board remedies in district court proceedings to review challenges to military personnel actions); *Crane v. Sec'y of the Army*, 92 F.Supp.2d 155, 161–63 (W.D.N.Y.2000); *Kosnik v. Peters*, 31 F.Supp.2d 151 (D.D.C.1998). *Contra* E. Roy Hawkens, *The Exhaustion Component of the Mindes Justiciability Test Is Not Laid to Rest by Darby v. Cisneros*, 166 Mil. L. Rev. 67 (2000) (arguing that *Darby* is inapplicable to military claims). Thus, the decisions on which Mr. Martinez relies are neither controlling for us nor do we regard them as persuasive authority on the quite different question whether correction board remedies must be exhausted before a plaintiff may file a Tucker Act suit for back pay and affiliated relief.

### F

Mr. Martinez argues that it would be sound policy to require exhaustion of a

potential correction board remedy before permitting former service members to file suit in the Court of Federal Claims. It is true that there are often benefits to be obtained from pre-suit exhaustion of administrative remedies. *See McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Indeed, a recent congressionally mandated study resulted in a proposal for new legislation that would require service members to exhaust their remedies before the correction boards before obtaining judicial review of military personnel matters. *See* Report of the Committee on Judicial Review of Military Administrative Personnel Actions of the Department of Defense (1996). In light of the current state of the law, however, that is a step that must be taken either by Congress through legislation or by the military departments through regulation. Moreover, there are significant competing policy reasons that counsel against imposing a rigid exhaustion requirement.

First, requiring resort to a correction board would necessarily extend the period within which a discharge claim for back pay could be brought. Such an extension would naturally increase the risk that discharge claims would be stale, along with the risk of lost evidence, unavailable witnesses, and faded memories. *See Friedman,* 310 F.2d at 401–02. In addition, the passage of time would increase the potential liability of the United States for back pay and would make the availability of corrective action more difficult to effect. Thus, it might be relatively easy to effectuate corrective action—such as directing that an officer be reinstated and reconsidered for promotion—within a short period after the officer's improper discharge, but it would ordinarily be much more difficult to unravel the effects of an improper discharge many years after the fact.

Second, it is by no means clear that an exhaustion requirement would be favorable to service members generally. Although an exhaustion requirement may work to the advantage of Mr. Martinez in the unusual circumstances of this case, many service members might prefer to have the option of seeking an immediate judicial remedy rather than having to go through a correction board before having access to a court. A mandatory exhaustion requirement would make that course of action unavailable.

 Third, as a result of procedures employed by the Court of Federal Claims, the rule that the limitations period in Tucker Act suits is not tolled pending resort to correction board remedies does not deny claimants the right to review of correction board decisions nor does it deprive the Court of Federal Claims of the authority to issue a stay pending exhaustion of administrative remedies in appropriate cases. All that a service member need do to preserve both the judicial remedy and the right to a reviewable decision by the correction board is to file suit within six years of the date of discharge and request that the court action be stayed until the correction board proceeding is completed. The Court of Federal Claims often follows that practice in military claims cases. *See Richey,* 322 F.3d at 1320; *Engels v. United States,* 230 Ct.Cl. 465, 678 F.2d 173, 174–75 (1982); *Friedman,* 310 F.2d at 398. Nor is there any doubt as to the courts' authority to stay judicial proceedings pending correction board action. The Tucker Act provides express authorization for a court to require resort to administrative remedies such as the correction boards in cases in which the court deems it appropriate. *See* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any admin-

istrative or executive body or official with such direction as it may deem proper and just."). That statutory authority gives the courts the flexibility to require exhaustion of correction board remedies in cases in which the benefits of exhaustion are applicable, but to proceed directly to adjudication if the court concludes that resort to the correction board would not serve a useful purpose. Moreover, the risk of parallel administrative and judicial proceedings has been obviated by case law requiring that when the administrative process is initiated after judicial relief has been sought and is still pending, the claimant must exhaust the correction board process before returning to the Court of Federal Claims. *Richey*, 322 F.3d at 1325–26; *Cunningham v. United States*, 212 Ct.Cl. 451, 549 F.2d 753, 765 (1977).

Finally, even if the service member chooses to complete correction board proceedings before filing suit, the generous six-year limitations period for Tucker Act suits will normally accommodate the correction board proceedings with ample time remaining within which a suit can be filed. This case demonstrates that point. Mr. Martinez obtained a ruling from the Correction Board in August 1995, only three

and one-half years after his separation from active duty. At that point, he still had two and one-half years within which to file a timely complaint in the Court of Federal Claims. Although he failed to file his complaint within that period, he has not suggested any circumstances that made it impossible for him to do so, nor has he suggested that the applicable rule was unsettled or that he was misled into believing that he could file his Tucker Act action more than six years after the date of his separation from active duty. The fact that in this unusual case Mr. Martinez failed to take the simple step of filing his complaint within six years of his separation from active duty is not a sufficient reason for us to change a rule that has been applied for many years, without causing apparent difficulty, and which may afford some additional flexibility to litigants.

■ Accordingly, we hold that Mr. Martinez's cause of action for recovery of the monetary losses he suffered as a result of his discharge from active duty, and for the ancillary equitable relief that he sought in his complaint, accrued on the date of the discharge. The statute of limitations for filing suit in the Court of Federal Claims therefore began to run at that time.[3]

---

**3.** It is clear that Mr. Martinez's cause of action did not accrue at the time he was discharged from the United States Army Reserve. Between 1992 and 1997, Mr. Martinez was a member of the Reserves, but not serving on active duty. He was finally separated from the Reserves in March 1997, which was within six years of the date he filed his complaint in the Court of Federal Claims. His complaint, however, requested reinstatement to active duty in the Reserves, not merely reinstatement in the Reserves in a non-active-duty status. Because Mr. Martinez was separated from active duty in 1992, his monetary and incidental equitable claims with respect to his active duty status accrued at that time, not in 1997. Service members on active duty are entitled to basic pay pursuant to 37 U.S.C. § 204(a), while reservists are paid only for the

drills and training they actually attend, *see* 37 U.S.C. §§ 204(a)(2), 206(a). As such, Mr. Martinez's suit for back pay is limited to the basic pay he would have received had he remained on active duty, because he would not be entitled to a pay remedy for improper discharge from the Reserves. *See Palmer v. United States*, 168 F.3d 1310, 1314 (Fed.Cir. 1999) ("The consequence of th[e] difference in pay entitlement between full-time active duty personnel and those serving part-time reserve duty is that a member who is serving in part-time reserve duty in a pay billet, or was wrongfully removed from one, has no lawful pay claim against the United States for unattended drills or for unperformed training duty."); *Dehne v. United States*, 970 F.2d 890, 894 (Fed.Cir.1992).

## IV

Mr. Martinez's second argument is that even if the statute of limitations has run on an action directly challenging his separation from active duty and consequent loss of pay, his complaint states a separate cause of action on which the statute of limitations has not run. He argues that because his complaint directly challenges the Correction Board's decision and not just his separation from active duty, he has stated a separate cause of action asserting error by the Correction Board in not granting him relief. That separate cause of action, he asserts, did not accrue until the Correction Board rendered its decision in August 1995. Accordingly, he claims that his complaint, filed in August 1998, was timely.

The problem with Mr. Martinez's "second cause of action" theory is that in order for Mr. Martinez's claim to be within the Tucker Act jurisdiction of the Court of Federal Claims, it had to be for money owing to him, and the only money that he claims is owing to him is the back pay withheld from the date of his separation from active duty in February 1992 and the forfeiture of pay pursuant to his Article 15 punishment in 1991. If he is entitled to the money that forms the basis for his Tucker Act suit, that right accrued in 1991 and 1992 when he was deprived of the money that is the subject of the action, not in 1995 when the Correction Board in effect reaffirmed the Army's decision that he was not entitled to those funds. Thus, the cause of action for back pay stemming from Mr. Martinez's separation from active duty first accrued on the date of his separation from active duty. It did not accrue for a second time when the Correction Board refused to grant Mr. Martinez's request for relief, including back pay to the date of his separation.

## A

Mr. Martinez's "second cause of action" theory for extending the limitations period is not new. The same argument was presented to and rejected by the Court of Claims 40 years ago in *Friedman v. United States,* 159 Ct.Cl. 1, 310 F.2d 381 (1962), and the passage of time has not given the argument any greater force.

Addressing the same issue in the context of a claim for retirement benefits, Judge Davis, writing for the Court of Claims, explained the point well:

> It is argued that, once the Correction Board has acted, the claim is founded upon the 1951 Act providing for Correction Boards to change military records to correct errors or remove injustices. But this is again to confound a procedural remedy with a substantive cause of action. . . . The Correction Board statute merely provides one remedy for enforcing [the substantive] right . . . The Act of Congress upon which the claim is founded—in the sense of the Tucker Act—is the substantive retirement statute, not the provision for boards or other methods for implementing that right. . . . The 1951 Act is no different in kind from comparable federal statutes providing a remedy for rights found on other legislation or other regulations.

310 F.2d at 399–400. Nor does the availability of judicial review of correction board decisions change the analysis. Again, as Judge Davis explained:

> [I]t does not follow from the general existence of judicial review for Correction Board decisions that those decisions create a *new* substantive cause of action which has its own, *new*, limitations period. That a tribunal's rulings are subject to judicial review means that the administrative decision is open to scrutiny by a court, if a timely judicial proceeding is

filed—not that the administrative tribunal's decision, in itself, becomes the new measure of the plaintiff's judicial rights. There is a profound difference between a legislature's providing for further review of a ruling on a cause of action and its creating a new and independent cause of action. . . . Judicial review and substantive claim are entirely separate concepts. The former is usually provided to see whether the latter is valid or has been properly enforced, but the establishment of review does not *ipso facto* create a new substantive claim.

In short, as applied to our problem, the existence of judicial review does not, in itself, supply any basis for asserting that the limitations period runs from the time of the Correction Board's decision. All that the existence of judicial review means is that the Board's decision will be reviewed, in a proper case, if a timely suit is brought.

*Id.* at 397 (emphasis in original). *Accord Real v. United States,* 906 F.2d 1557, 1560 (Fed.Cir.1990); *Hurick,* 782 F.2d at 987; *Giesler v. United States,* 230 Ct. Cl. 723, 725 1982 U.S. Ct.Cl. Lexis 95 (1982); *Ramsey v. United States,* 215 Ct.Cl. 1042, 1043 (1978); *Eurell v. United States,* 215 Ct.Cl. 273, 566 F.2d 1146, 1148 (1977); *Merriott v. United States,* 163 Ct.Cl. 261, 263 (1963).

■■■■ As discussed in Part III above, it is well settled that the statute of limitations for Tucker Act claims is not tolled by the claimant's exercise of his right to seek permissive administrative review of his claim. That principle cannot be subverted by simply recharacterizing the effect of a correction board decision on the limitations period as generating a second cause of action rather than tolling the limitations period on the first. Just as the limitations period is not tolled by resort to a nonmandatory administrative remedy, a Tucker Act cause of action does not accrue for a second time when the prospective plaintiff exercises such rights. Thus, for example, in certain circumstances a party with a Tucker Act cause of action may seek and obtain relief for the same claim from the Government Accounting Office. The statute of limitations, however, runs from the date that the cause of action initially accrued, and a new cause of action does not accrue if and when the Government Accounting Office denies relief. *See Fitzgerald v. United States,* 226 Ct.Cl. 542, 544 (1980); *Air Express Int'l Corp. v. United States,* 194 Ct.Cl. 517, 439 F.2d 157, 159 (1971); *Burich v. United States,* 177 Ct.Cl. 139, 366 F.2d 984, 986 (1966); *Iran Nat'l Airlines Corp. v. United States,* 175 Ct.Cl. 504, 360 F.2d 640, 642 (1966).

■■■■ The reason underlying this rule is the same as the reason underlying the rule against tolling the limitations period for nonmandatory administrative remedies: The creation of a permissive administrative remedy, either by statute or by regulation, does not affect the time period for which Congress has waived sovereign immunity and permitted judicial relief to be sought. To make the point outside the context of the correction boards, consider the following hypothetical case: Suppose a government agency provided an additional option through which an aggrieved party could seek relief from agency action, for example by giving a particular agency official the power to overrule agency decisions and grant monetary relief to private claimants. The creation of such an office would give claimants an additional, permissive option in seeking to vindicate their claims against the agency. But if the agency official denied a particular claim, it would not make sense to say that the denial would give rise to a second accrual of the original claim, so that the statute of limitations for a Tucker Act action on that claim

would begin anew as of the date of the agency official's denial. *Hurick* simply applies that principle to claims submitted to the correction boards, and, in our view, properly so.

## B

Mr. Martinez argues that this court's decision in *Hurick* is contrary to the decisions of several other courts of appeals. In particular, he cites *Ortiz v. Secretary of Defense*, 41 F.3d 738 (D.C.Cir.1994); *Blassingame v. Secretary of the Navy*, 811 F.2d 65, 70 (2d Cir.1987); *Smith v. Marsh*, 787 F.2d 510 (10th Cir.1986); *Dougherty v. U.S. Navy Bd. for Corr. of Naval Records*, 784 F.2d 499 (3d Cir.1986); and *Geyen v. Marsh*, 775 F.2d 1303 (5th Cir.1985).

The cases on which Mr. Martinez relies were all nonstatutory review actions under the APA seeking equitable relief, not Tucker Act actions for money. Each involved a request for an upgrade in the classification of the plaintiff's discharge, in most instances from "undesirable" to "honorable." Because the plaintiffs did not seek monetary relief, and thus had no Tucker Act remedy, they were able to invoke the APA's waiver of sovereign immunity for actions against the United States "seeking relief other than money damages," 5 U.S.C. § 702, and they were able to challenge the correction boards' decisions as they were "adversely affected or aggrieved," *id.*, by "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230–31 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).

As challenges to final agency action, the APA actions challenged the board decisions that denied requests for changes in discharge status; they did not challenge the underlying discharges themselves. Because the APA actions did not turn on a claim for money, the actions could be said to accrue at the time of the challenged agency action—the action of the correction board in question—rather than at the time of the action that caused the plaintiff monetary loss—the discharge itself. Indeed, the very cases on which Mr. Martinez relies recognized the distinction between an APA action to review a correction board decision denying an upgrade in discharge status and a back pay suit challenging the discharge itself under the Tucker Act. *See Blassingame*, 811 F.2d at 72; *Smith*, 787 F.2d at 511–12; *Dougherty*, 784 F.2d at 501–02 & n. 10; *Geyen*, 775 F.2d at 1308–09; *see also Ballenger v. Marsh*, 708 F.2d 349 (8th Cir.1983) (expressly distinguishing between back pay claims under the Tucker Act and a claim for "corrective" action upgrading a discharge from dishonorable to honorable).

The difference is important. The cause of action in Mr. Martinez's Tucker Act suit was for the denial of money; that cause of action therefore accrued when he was separated from active duty and his monetary injury began. His cause of action did not accrue when the Correction Board declined to overturn his separation, because that action did not cause him monetary injury, but merely failed to remedy the injury he had previously suffered. Because the Court of Federal Claims lacks APA jurisdiction, *see Murphy v. United States*, 993 F.2d 871, 874 (Fed.Cir.1993), the trial court was not empowered to treat this case as a nonmonetary challenge to final agency action by the Correction Board; under the Tucker Act, the single cause of action necessarily arose at the time of the action that had monetary consequences for Mr. Martinez, and that was the date of his discharge from active duty.

To be sure, in monetary actions brought under the Tucker Act, the Court of Claims and the Court of Federal Claims have

often reviewed not only the underlying discharge actions, but also the actions of correction boards. *See Chappell v. Wallace,* 462 U.S. 296, 303, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence." (citing Court of Claims cases)); *Porter v. United States,* 163 F.3d 1304 (Fed.Cir.1998); *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804 (1979); *Friedman v. United States,* 141 Ct.Cl. 239, 259, 158 F.Supp. 364 (1958). Thus, we have treated a claim "for back pay within our jurisdiction" as "an appropriate occasion for reviewing the actions of the correction boards." *Sanders,* 594 F.2d at 812. And in so doing, we have granted relief if we have found that the correction board's decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law. *Porter,* 163 F.3d at 1311; *Armstrong v. United States,* 205 Ct.Cl. 754, 761 (1974). But because the underlying basis for the suit is the denial of back pay, *see Skinner v. United States,* 219 Ct.Cl. 322, 594 F.2d 824, 831 (1979), we have consistently held that the limitations period is established by the date of accrual, which is the date on which the service member was denied the pay to which he claims entitlement.

Accordingly, the approach taken by other circuits in adjudicating non-monetary challenges to correction board action is not inconsistent with the approach we have taken in the very different context of Tucker Act suits. We therefore reject Mr. Martinez's suggestion that we should overrule *Hurick* in order to bring ourselves into line with other circuit courts that have reached different results regarding the statute of limitations applicable to military discharge cases.

### C

The dissent asserts that a new cause of action for monetary relief accrued in this case when the correction board acted, because the correction board statute, 10 U.S.C. § 1552, is a money-mandating statute. That is, because Mr. Martinez would have been entitled to various forms of relief, including money, if he had prevailed before the correction board, the dissent argues that a new cause of action for that relief necessarily accrued at the time of the correction board decision. That theory conflates the remedy granted by the correction board statute with the underlying cause of action for improper discharge. Regardless of what procedure Mr. Martinez invoked to seek relief, his underlying cause of action for money was still necessarily based on the alleged improper discharge: if the discharge was not unlawful, Mr. Martinez is not entitled to monetary relief.

At the time of his separation, Mr. Martinez had a right to sue for improper discharge and to obtain money if he could prove his case. At the time the correction board acted, he still had that right. The injury caused by the separation was not altered or exacerbated by the correction board action. The only thing that was different was that he had exercised the optional remedy provided him by section 1552, which offered him an alternative means of obtaining relief. Because Mr. Martinez is entitled to monetary relief only if he can show that he was improperly separated, a suit in the Court of Federal Claims that purports to challenge the correction board decision is in essence an action challenging his separation. Thus, the correction board statute provides for a monetary remedy, but the underlying cause of action to which that remedy applies is unlawful termination. And that cause of action accrued at the time of discharge.

Section 1552 is "money-mandating" in the sense that it requires that the

government grant monetary relief to a service member if the correction board determines that the service member's record should be corrected in a way that entitles the service member to back pay. *See Sawyer v. United States,* 930 F.2d 1577, 1580 (Fed.Cir.1991); *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 812–13 (1979). But section 1552 is not the source of the right to back pay; that right comes from a different statute, such as the Military Pay Act, 37 U.S.C. § 204. Accordingly, even though section 1552 mandates the payment of money if the correction board concludes that the service member's discharge was unlawful, section 1552 is not the "money-mandating" statute that gives rise to the cause of action that provides the basis for a Tucker Act suit in the Court of Federal Claims.[4]

If the dissent were correct, the creation of any new, optional remedy that could result in the payment of money would give rise to a new Tucker Act cause of action. To expand upon the hypothetical case posited earlier, suppose Congress decided to provide yet another layer of administrative protection against improper discharge by allowing a soldier to request that the Secretary of Defense reopen any discharge case at any time, even after a correction board proceeding, and requiring the Secretary to reinstate the soldier with back pay if the Secretary concluded that the discharge was improper. Under the dissent's view, the creation of such an optional remedy would have the effect of creating yet a third Tucker Act cause of action based on the same discharge, with the six-year statute of limitations beginning to run anew from the Secretary's action denying the request for relief. That regime is contrary to the basic principle, established in the *Friedman* case and applied routinely since, that a Tucker Act action for money accrues when the claimant has exhausted all mandatory administrative remedies, and it does not "re-accrue" if and when the claimant subsequently seeks to exercise any optional administrative remedy including the remedy of application to a correction board.

## V

Mr. Martinez argues that, even assuming he has only a single cause of action and his cause of action accrued as of his discharge date, the statute of limitations was nonetheless tolled until November 4, 1993, when his ex-wife issued a sworn statement

---

4. We disagree with the government's suggestion that our cases are in conflict as to whether the correction board statute, 10 U.S.C. § 1552, is a "money-mandating" statute as that term is used in Tucker Act cases. The government cites a statement in *Dehne v. United States,* 970 F.2d 890, 894 (Fed.Cir. 1992) (section 1552 "does not mandate pay at all"), which it contends is inconsistent with decisions such as *Blum v. United States,* 227 Ct.Cl. 555, 559 n. 3 (1981) (section 1552 "is a statute expressly mandating compensation, and we can enforce it if the plaintiff should have been retired for disability but the Correction Board illegally failed to so find"). We discern no conflict. The point made by the court in *Dehne* was simply that section 1552 is not the source of the right to back pay, which must come from some other statute, and that absent an underlying "pay-mandating statute on which to base his Tucker Act claim," the correction board statute did not provide a basis for the plaintiff to obtain relief from the Court of Federal Claims. *Dehne,* 970 F.2d at 894. A different analysis applies when the correction board has granted relief and the service member seeks to enforce or challenge the implementation or scope of the remedial order, since in those cases the question whether the original discharge was lawful is no longer in issue and accrual therefore does not occur at the time of the allegedly improper discharge. *See Bonen,* 666 F.2d at 539–40; *Homcy,* 536 F.2d at 364–65; *DeBow v. United States,* 193 Ct.Cl. 499, 434 F.2d 1333, 1335 (1970); *Friedman,* 310 F.2d at 395.

accusing the sergeant's husband of fabricating the allegations about the purported affair between the sergeant and Mr. Martinez. He contends that although he was aware that he was being separated from active duty on February 25, 1992, he was not aware that his discharge was the product of a conspiracy between his ex-wife and others she enlisted to assist her in obtaining sole custody of her child. In response, the government argues that equitable tolling does not apply to the statute of limitations set forth in 28 U.S.C. § 2501 and that, even if it does, there is no basis for finding equitable tolling in this case.

### A

The government's argument as to the inapplicability of equitable tolling to section 2501 is based on three propositions. The government argues (1) the statute of limitations is a limited waiver of sovereign immunity; (2) in section 2501 Congress expressly waived sovereign immunity only for actions brought within six years of accrual or, in the case of persons under legal disability or "beyond the seas at the time the claim accrues," within three years after the disability ceases; accordingly, (3) every other suit brought more than six years after accrual is barred by sovereign immunity and thus is outside the jurisdiction of the Court of Federal Claims.

The government relies on *Soriano v. United States*, 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957), as its principal authority for the proposition that a statute of limitations against the federal government cannot be read to contain any provision for equitable tolling.[5] In *Soriano*, the plaintiff argued in pertinent part that his cause of action for just compensation for supplies taken from him by Philippine guerrillas

during the Japanese occupation of the Philippines was tolled during the pendency of the war. The Supreme Court rejected that argument. The Court noted that exceptions to statutes of limitations and conditions on which the government may be sued are not to be implied, and that in other statutes of limitations Congress had included exceptions for wartime, but not in section 2501. *Soriano*, 352 U.S. at 275–77, 77 S.Ct. 269.

■■■■■ It is well established that statutes of limitations for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional in nature. *See Block v. North Dakota*, 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *Frazer v. United States*, 288 F.3d 1347, 1351 (Fed. Cir.2002); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988); *Jones v. United States*, 801 F.2d 1334, 1335 (Fed.Cir.1986). As the Supreme Court has explained, however, that does not mean that courts may never recognize equitable tolling of statutory limitations periods in suits against the government. Instead, the Court has made clear that whether equitable tolling is available in suits against the government turns on congressional intent, i.e., whether Congress intended the particular statute of limitations at issue to be subject to tolling and, if so, under what circumstances.

In *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court addressed *Soriano* and concluded, notwithstanding the restrictive language in that case, that equitable tolling is available at least in some actions against federal entities. The Court explained that once Con-

---

5. The *Soriano* Court's treatment of the issue of equitable tolling, *see* 352 U.S. at 275–77, 77 S.Ct. 269, is distinct from its treatment of the

issue of accrual, *see id.* at 273–75, 77 S.Ct. 269, which we discussed in Part III–C, above.

gress has waived sovereign immunity, "making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, expansion of the congressional waiver." *Id.* at 95, 111 S.Ct. 453. That principle, the Court explained,

> is likely to be a realistic assessment of legislative intent as well as a practically useful principle of interpretation. We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States. Congress, of course, may provide otherwise if it wishes to do so.

*Id.* at 95–96, 111 S.Ct. 453. *See also Young v. United States,* 535 U.S. 43, 49–50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) ("Congress must be presumed to draft limitations periods in light of this background principle [of equitable tolling]."). Having embraced the principle of equitable tolling, however, the Supreme Court declined to give it an expansive application. While the Court suggested that the doctrine would apply "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period" or "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass," the Court explained that the doctrine had been applied "sparingly" by federal courts in the past and would not in any event be applied "to what is at best a garden variety claim of excusable neglect." *Irwin,* 498 U.S. at 96, 111 S.Ct. 453.

In subsequent cases, the Supreme Court has made clear that *Irwin* did not mean that all limitations periods governing suits against the government would be subject to equitable tolling. In both *United States v. Brockamp,* 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997), and *United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998), the Court rejected arguments that equitable tolling was available under the particular statutes of limitation at issue in those cases. In *Brockamp,* the Court emphasized the "unusually emphatic" language of section 6511 of the Internal Revenue Code of 1986, the statute limiting the period for filing tax refund claims. Section 6511, the Court explained, restates the limitations period "several times in several different ways," 519 U.S. at 351, 117 S.Ct. 849, and "sets forth its limitations in a highly detailed technical manner that, linguistically speaking, cannot easily be read as containing implicit exceptions." *Id.* at 350, 117 S.Ct. 849. Moreover, the Court noted that section 6511 contained explicit exceptions to its basic time limits, which did not include equitable tolling. *Id.* at 351, 117 S.Ct. 849. Finally, the Court explained that the underlying subject matter—tax collection—is inconsistent with a system of case-specific exceptions for equitable tolling, which could create significant administrative difficulties. *Id.* at 352, 117 S.Ct. 849. In summary, the Court stated: "Section 6511's detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together, indicate to us that Congress did not intend courts to read other unmentioned, openended, 'equitable' exceptions into the statute that it wrote." *Id.*

In *Beggerly,* the Court similarly rejected an argument that equitable tolling is available under a limitations statute governing suits against the United States, in this case the 12–year statute of limitations for suits under the federal Quiet Title Act, 28 U.S.C. § 2409(g). The Court noted the "unusually generous" length of the limitations period, and the fact that the statute contained an express provision that the

limitations period would not begin to run until the plaintiff "knew or should have known of the claim of the United States," which the Court characterized as already effectively allowing for equitable tolling. *Beggerly*, 524 U.S. at 48, 118 S.Ct. 1862. Under those circumstances, the Court concluded, "extension of the statutory period by additional equitable tolling would be unwarranted." *Id.* at 49, 118 S.Ct. 1862.

Following the Supreme Court's lead, we have determined that certain statutes of limitations are subject to equitable tolling and that others are not, depending on the language and context of the particular limitation statute at issue. *See Jaquay v. Principi*, 304 F.3d 1276, 1286 (Fed.Cir. 2002) (en banc) (equitable tolling available in a veterans claims case); *Bailey v. West*, 160 F.3d 1360, 1362–68 (Fed.Cir.1998) (en banc) (same); *Brice v. Sec'y of Health & Human Servs.*, 240 F.3d 1367, 1370–71 (Fed.Cir.2001) (equitable tolling not available in a compensation action under the National Childhood Vaccine Injury Act); *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461–63 (Fed.Cir.1998) (equitable tolling not available in a tax refund case).

Since the Supreme Court's decision in *Irwin*, we have not decided whether equitable tolling applies with respect to the general statute of limitations for Tucker Act claims, 28 U.S.C. § 2501. In fact, we have recently declined to decide "whether equitable principles may ever toll the statute of limitations codified in § 2501." *Frazer v. United States*, 288 F.3d 1347, 1353 (Fed.Cir.2002). To be sure, section 2501 appears to have more in common with the limitations statute at issue in *Irwin* than with the statutes at issue in *Brockamp* and *Beggerly*. Actions under section 2501 are, by definition, for money damages and thus have much in common with ordinary actions at law between private par-

ties. Moreover, unlike the tax statute in *Brockamp*, section 2501 is not highly technical and was not designed to apply exclusively to a complex administrative program in which equitable tolling could be disruptive. On the other hand, section 2501 differs from the *Irwin* statute in that it contains its own tolling provision for persons "under legal disability or beyond the seas at the time the claim accrues," a factor that the Court in *Brockamp* regarded as weighing against recognizing other nonstatutory exceptions to the limitations period. *See Brockamp*, 519 U.S. at 351–52, 117 S.Ct. 849. Because the matter is not free from doubt, we follow the same course here that we followed in *Frazer*: We decline to decide whether equitable tolling is generally available under section 2501, because even if we held that it is, Mr. Martinez has not made a sufficient factual showing to invoke equitable tolling in this case, for the reasons given by the Court of Federal Claims, as we explain below.

**B**

▮▮▮▮▮ Our cases, like the Supreme Court's decision in *Irwin*, make clear that equitable tolling against the federal government is a narrow doctrine. As the Supreme Court noted in *Irwin*, mere excusable neglect is not enough to establish a basis for equitable tolling; there must be a compelling justification for delay, such as "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin*, 498 U.S. at 96, 111 S.Ct. 453. In this case, the Court of Federal Claims held that that standard was not satisfied, and we agree.

Mr. Martinez argues that until his wife issued her sworn statement regarding the alleged fabrication of charges against him, he had no basis on which to seek relief and thus, until that time, was excused from the

requirement of filing his complaint. Mr. Martinez, however, was fully aware of the injury he had suffered at the time he was separated from active duty, and he was aware that, as he views the matter, he was the victim of fabricated charges. The only thing that was different after his ex-wife made her sworn statement in November 1993 was that his claim then had more support than his uncorroborated word. The fact that he had sounder support for his claim at that point, however, is not a sufficient basis to establish equitable tolling. *See Vincin v. United States,* 199 Ct.Cl. 762, 468 F.2d 930, 933 (1972) ("this court has refrained from stretching the statute of limitations in an illegal discharge case so that it would commence to run not from the date of discharge but from the date of some subsequent decision illustrating its illegality"); *Japanese War Notes Claimants Ass'n v. United States,* 178 Ct. Cl. 630, 373 F.2d 356, 359 (1967). The statute of limitations therefore began to run in February 1992, and by the time Mr. Martinez filed his action in the Court of Federal Claims, the limitations period on his action had run.

### C

■ Mr. Martinez alludes to another argument with regard to the timeliness of the complaint, but it too does not provide any ground for relief. In his brief, Mr. Martinez invokes authority from this court holding that the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed. That legal principle is well settled in our cases. *See, e.g., Alliance of Descendants of Tex. Land Grants v. United States,* 37 F.3d 1478, 1482 (Fed. Cir.1994); *Catawba Indian Tribe v. United States,* 982 F.2d 1564, 1571–72 (Fed.Cir. 1993); *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.

Cir.1988); *Kinsey v. United States,* 852 F.2d 556, 557 n. * (Fed.Cir.1988); *Welcker v. United States,* 752 F.2d 1577, 1580 (Fed. Cir.1985); *Giesler v. United States,* 230 Ct. Cl. 723, 725, 1982 U.S.Ct.Cl. Lexis 95 (1982). The government agrees with that legal rule, which is based on a construction of the term "accrues" in section 2501. That rule is distinct from the question whether equitable tolling is available under that statute, although the term "tolling" is sometimes used in describing the rule.

■ For the same reasons that his equitable tolling claim is factually insufficient, however, Mr. Martinez's "accrual suspension" argument fails as well. The "accrual suspension" rule is "strictly and narrowly applied: ... [The plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." *Welcker,* 752 F.2d at 1580. Mr. Martinez was not unaware of the existence of his injury and the acts giving rise to his claim. As of the date of his discharge from active duty, he knew that he had been discharged and, as far as he was concerned, his discharge had been unlawfully procured. Nothing about his ex-wife's statement disclosed the existence of a claim of which he was previously unaware. The statement simply provided him with additional ammunition with which to pursue the claim. The acts of alleged fabrication may have contributed to Mr. Martinez's injury, but the fact of his injury was never unknown to him. Mr. Martinez's claim therefore did not accrue on November 4, 1993, when his wife made the statement regarding the alleged fabrication of the charges against him.

### VI

■ Finally, Mr. Martinez argues that, if this court agrees with the trial court

with respect to the statute of limitations, it should transfer the non-monetary portion of this case to a United States District Court under 28 U.S.C. § 1631 rather than dismiss the action.

Section 1631 provides that if a civil action is filed in a court that "finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action ... to any other such court in which the action ... could have been brought at the time it was filed." The problem with Mr. Martinez's transfer request is that because his complaint sought money and relief ancillary to the request for money, the Court of Federal Claims could have granted all the relief requested in the complaint if the complaint had been timely filed. Section 10(c) of the APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Because there was an adequate remedy in the Court of Federal Claims for the claims set forth in Mr. Martinez's complaint, a district court would not have had APA jurisdiction over those claims (and the waiver of sovereign immunity under section 10(a) of the APA, 5 U.S.C. § 702, would not have been available). *See Consol. Edison Co. v. United States,* 247 F.3d 1378, 1383 (Fed.Cir.2001); *Kanemoto v. Reno,* 41 F.3d 641, 644 (Fed.Cir.1994); *Mitchell v. United States,* 930 F.2d 893, 896 (Fed.Cir.1991). The fact that the complaint was untimely filed in the Court of Federal Claims does not mean that court could not offer a full and adequate remedy; it merely means that Mr. Martinez did not file his complaint in time to take advantage of that remedy. *Mitchell,* 930 F.2d at 897. Accordingly, Mr. Martinez's money-based complaint could not have been brought in the district court in the first instance, and we therefore lack authority under section 1631 to transfer it to the district court at this juncture.

This case is not like *James v. Caldera,* 159 F.3d 573 (Fed.Cir.1998), in which a federal district court transferred a serviceman's claim to the Court of Federal Claims. On the serviceman's appeal, this court held that certain of the plaintiff's claims—in particular, his claims as to the bar to his reenlistment—were not for money damages and the Court of Federal Claims lacked jurisdiction over those claims. Because the Court of Federal Claims lacked jurisdiction over some of the plaintiff's claims, the court in *James* reversed the portion of the district court's order transferring those claims to the Court of Federal Claims, and it directed the district court to reconsider whether it had jurisdiction with respect to another claim. In this case, by contrast, none of the claims asserted in the complaint—if they had been timely asserted—would have been outside the competence of the Court of Federal Claims, as either direct monetary claims or as claims for relief ancillary to the grant of a monetary remedy. Accordingly, we decline Mr. Martinez's request that we transfer this case to a United States District Court for further proceedings in that forum.

Each party shall bear its own costs for this appeal.

*AFFIRMED.*

PLAGER, Senior Circuit Judge, with whom Chief Judge MAYER and Circuit Judges PAULINE NEWMAN, GAJARSA, LINN, and DYK join, dissenting.

As I read it, the majority opinion gives short shrift to a well-established proposition of law: a money-mandating statute or regulation provides a basis for a cause of action under the Tucker Act. The corollary to that proposition is equally well–established: the statute of limitations barring such cause of action begins to run from the

time of an adverse decision under the statute or regulation, not before. The majority's failure to properly apply these propositions to the case before us leaves me with no alternative but to respectfully dissent.

Gabriel Martinez petitioned the Army Board for Correction of Military Records (hereafter Board or Correction Board) for relief from the terms of his discharge from the Army. The Board denied his request. Martinez subsequently filed a complaint in the Court of Federal Claims alleging that the decision of the Board was arbitrary and capricious and an abuse of discretion. At the time he filed his suit, more than six years had elapsed since the date of Martinez's initial discharge, though not from the date of the decision of the Correction Board.

Constrained by our precedent, specifically *Hurick v. Lehman*, 782 F.2d 984 (Fed.Cir.1986), the Court of Federal Claims dismissed the complaint as time-barred by the statute of limitations, 28 U.S.C. § 2501, on the ground that the statute runs from the date of discharge, not from the date of the Board's decision.

As a matter of law, that rule is no longer supportable, if it ever was. The statutes and regulations applicable to the Army Correction Board leave little doubt that they are "money-mandating"; a complaint such as Captain Martinez's challenging the correctness of a decision of the Board properly lies under the Tucker Act, and the statute of limitations must necessarily run from the time of the Board decision. Applying the correct law to the facts of the Martinez case, the judgment of the Court of Federal Claims should be reversed.

## 1.

A veteran who wishes to have judicial review of a military service's decision to discharge him can bring suit in the Court of Federal Claims. The jurisdictional basis for the suit is the Tucker Act, 28 U.S.C. § 1491, which provides that court with jurisdiction over certain kinds of suits against the United States. Included are suits for money "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1).

In *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Supreme Court explained that the Tucker Act merely confers jurisdiction in the Court of Federal Claims whenever a substantive right exists; a substantive right is one, independent of the Tucker Act, that is enforceable against the United States for money damages. This concept gave rise to what is often referred to as the requirement that a plaintiff invoke a "money-mandating" source, such as a federal statute or a regulation of an executive department, as part of his cause of action under the Tucker Act. Failure to establish the existence of such a money-mandating source means that the plaintiff fails to state a claim on which relief can be granted. *Gollehon Farming v. United States*, 207 F.3d 1373, 1379 (Fed.Cir.2000); *Palmer v. United States*, 168 F.3d 1310, 1312–13 (Fed.Cir.1999) (explaining the difference in Tucker Act jurisprudence between a lack of jurisdiction and a failure to state a claim on which relief can be granted).

If a claim states a cause of action under the Tucker Act, the Act expressly provides that the Court of Federal Claims may, in addition to the monetary remedy, "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." 28 U.S.C. § 1491(a)(2). The Act further authorizes the court to "remand appropriate matters to any administrative or executive body or official

with such direction as it may deem proper and just." *Id.*

Under what is known as the Little Tucker Act, 28 U.S.C. § 1346(a)(2), the same suit, presumably with the same possible remedies, *see Bobula v. United States Dep't of Justice,* 970 F.2d 854, 859 (Fed. Cir.1992), can be filed in a federal district court, provided only that the amount at issue does not exceed $10,000. Whether decided in the Court of Federal Claims or in a district court, any appeal from the trial court's judgment in a suit brought under either of the Tucker Acts will be reviewed on appeal by, and decided under the law of, the Court of Appeals for the Federal Circuit. 28 U.S.C. § 1295(a)(2), (3).

Mr. Martinez argues that his cause of action did not accrue until the date of the Correction Board decision, 1995 (initial decision) or 1997 (reconsideration), because he challenged only the Board's refusal to correct his records and not the Army's original discharge decision. (His complaint clearly focuses his challenge on the decision of the Correction Board.) Under either of these dates his 1998 filing in the Court of Federal Claims would be timely, i.e., within six years of the time his cause of action accrued. He asserts that had the court undertaken a review of the merits of his case, that review would be limited to consideration of the administrative record compiled by the Board, citing RCFC 56.1(a), and subject to the traditional administrative law "arbitrary and capricious" review standard.

The Government responds that the Court of Federal Claims, following *Hurick,* correctly held that Mr. Martinez's cause of action is based on his alleged wrongful discharge in 1992, not on the Board's decisions regarding that discharge which occurred some years later. The Government asserts that the *Hurick* decision rests upon sound principles: (1) Congress has only assented to a Tucker Act suit relating to an allegedly unlawful discharge, and the suit may only be construed as a suit for monetary relief; (2) the long-standing rule has been that a claim for unlawful discharge accrues upon the date of loss of pay or discharge, and thus the claim first accrues on that date, because no other act by either party remains to be performed before suit may be filed; (3) the plaintiff chose to sue in the Court of Federal Claims, and chose to sue for money; his challenge to the Correction Board's decision is merely ancillary to his jurisdiction-creating pay claim. Thus the denial by the Board does not create a new cause of action.

I do not agree with the Government's approach to the question of whether a Board decision creates a new cause of action, or with the majority's approval of that approach. The Government posits that Mr. Martinez's challenge to the adverse Board decision is merely ancillary to his discharge and, thus, did not create a new cause of action, even if, ultimately, implementation of a Correction Board decision might give rise to liability for damages by the United States. The Government relies for support for its position on *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), which reversed a 1968 decision by the Court of Claims.

The *King* case is hardly support for the Government's position. First, the case turned on whether the Court of Claims had authority to grant declaratory relief in the absence of a claim for actual, presently due money damages; the Court of Claims thought it had authority to grant the requested relief, the Supreme Court said it did not. That case is not on point with regard to the issue before us. Second, our predecessor court, the Court of Claims, specifically rejected that same argument

by the Government regarding the *King* case twenty years ago, holding that 10 U.S.C. § 1552, the Correction Board statute, provided an independent basis for a cause of action. *Blum v. United States,* 227 Ct.Cl. 555, 559 n. 3 (1981).

The point is not whether Mr. Martinéz had a cause of action for an allegedly wrongful discharge when it occurred in 1992; no one says he did not. Nor is the point whether an appeal to a Correction Board is necessarily "ancillary" to an allegedly wrongful discharge, in the sense that without the earlier alleged wrong, there would have been no appeal to the Board; the relationship between the two is obvious. Rather, the question here is whether, at the time of the Correction Board decision, the statutes and regulations governing the Correction Board were "money-mandating" so that, in accordance with the Supreme Court's ruling in *Testan,* the decision of the Board creates as a matter of law a separate cause of action under the Tucker Act. If so, then a complainant has a cause of action under the Tucker Act, a cause of action that arises when the decision is rendered. That is not a question of parsing prior precedent, or of judicial syllogisms. That is a question of statutory and regulatory construction; the answer lies in an examination of the applicable statutes and regulations.

### 2.

Section 1552 of title 10 of the United States Code provides for the correction of military records and for payment of claims incident thereto. The statute authorizes the Secretary of a military department to correct any military record of the Secretary's department "when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). With certain limited exceptions, "such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department." *Id.* Ordinarily a request for correction must be filed within three years after the claimant discovers the error or injustice, but the Board may waive the requirement "in the interest of justice." *Id.* § 1552(b).

Importantly, subsection (c) provides that the Secretary "may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section, the amount is found to be due the claimant." In other contexts we have held that a statute using the term "may" rather than "shall" is nevertheless "money-mandating." *See McBryde v. United States,* 299 F.3d 1357, 1362 (Fed.Cir.2002) ("[T]he use of the word 'may' does not, by itself, render a statute wholly discretionary, and thus not money-mandating."); *Doe v. United States,* 100 F.3d 1576, 1579–83 (Fed.Cir.1996) (holding that the federal moiety statute, though using the term "may" and thereby according the Secretary some discretion, is money-mandating). However, because of the clear mandate of the regulations adopted by the Army pursuant to this statute, as explained next, it is unnecessary to decide whether this statute alone would be sufficient basis for a Tucker Act remedy.

In the case of the Army, the Secretary has adopted regulations, 32 C.F.R. § 581.3, establishing the Army Board for Correction of Military Records, and the procedures governing the Board's activities. The chair of the Board is directed to ensure that the applicant receives a full and fair opportunity to be heard, and to certify the record of the proceedings. *Id.* § 581.3(b)(3). The Board members are instructed to review all applications that are

properly before them to determine the existence of error or injustice, *id.* § 581.3(b)(4)(i), and if persuaded that material error or injustice exists, to direct changes in military records to correct the error or injustice. *Id.* § 581.3(b)(4)(ii).

Under the regulations, the Director, Defense Finance and Accounting Service (DFAS), is responsible for settlement of monetary claims arising from activities of the Correction Board. Specifically, 32 C.F.R. § 581.3, subsection (h), entitled "Claims/Expenses," provides that "[t]he ABCMR [Correction Board] will furnish DFAS copies of decisions potentially affecting monetary entitlement or benefits. The DFAS will treat such decisions as claims for payment by or on behalf of the applicant." *Id.* § 581.3(h)(2)(i) (emphasis added). The subsection further provides that "[t]he DFAS will settle claims on the basis of the corrected military record." *Id.* § 581.3(h)(2)(ii) (emphasis added).

Read together, these provisions of statute and regulations leave little doubt that the decision of the Board has direct consequences regarding an applicant's monetary remedy. A favorable result before the Board mandates that the applicant be paid any monies due him; no discretion exists in the hands of the paymaster, beyond that of determining the correct amount due. This clearly meets the test set out by the Supreme Court: "the asserted entitlement to money damages depends upon whether any federal statute [or regulation] 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Testan,* 424 U.S. at 400, 96 S.Ct. 948 (citation omitted). (Although not an issue in *Testan,* the Tucker Act expressly includes, along with an Act of Congress, a regulation of an executive department as a money-mandating source.)

There can be no doubt that once a favorable decision by the Correction Board is rendered, the statute and regulations create an enforceable obligation against the Government, and that no further action by the applicant to perfect that obligation is required. The converse then is true: since the statute and regulations governing the Board processes and outcome are "money-mandating," a negative decision by a Board that is challenged in a well pleaded complaint as being in violation of law, thus denying the applicant a monetary remedy otherwise due, would constitute a cause of action under the Tucker Act. As our predecessor court stated in *Blum v. United States:*

> We do not agree with [the Government] that *Ray* [*v. United States,* 197 Ct.Cl. 1, 453 F.2d 754 (1972)] can be distinguished solely on the ground that in *Ray* the Board had already ruled in the plaintiff's favor on disability retirement before the case was filed here. If we were ultimately to find in the present suit that the Board had acted wrongfully in denying plaintiff's request for a review of his retirement classification, and that plaintiff was actually entitled to receive disability retirement, we would have the power, under *Ray* and 10 U.S.C. § 1552 *supra,* to grant plaintiff the relief he seeks, regardless of the fact that the Correction Board had refused to take the initiative and correct its own error.

227 Ct.Cl. at 558–59 (footnotes omitted).

Under the plain meaning of the statutes and regulations applicable to a decision of the Army Correction Board relating to an alleged unlawful discharge, there is created a separate cause of action reviewable independently of the original discharge decision. A claim challenging a Correction Board decision relating to a discharge

therefore accrues on the date of the Board's final decision.

Regrettably, the majority opinion addresses the statutory framework only glancingly, and the regulatory provisions not at all. *See* Maj. op. at 1314–1315. I do agree with the majority that it is unnecessary to accept the Government's invitation to review and resolve conflicts in the prior precedents of this court and its predecessor, the Court of Claims. Over the years the cases have dealt with disparate problems, with disparate results.

Some cases involved disability claims, and some involved military discharges as such, rather than the after effects of a Correction Board decision. Some cases appear to announce rules that are in direct conflict, though ultimately not. For example, our predecessor court in the *Blum* case, cited above, stated without question that § 1552, the statute at issue here, is indeed money-mandating: "10 U.S.C. § 1552 is a statute expressly mandating compensation, and we can enforce it if the plaintiff should have been retired for disability but the Correction Board illegally failed to so find." *Blum,* 227 Ct.Cl. at 559 n. 3 (holding that § 1552 was a sufficient basis for stating a claim for relief under the Tucker Act, even though not pled as such). Yet a later decision of this court stated the contrary. *See Dehne v. United States,* 970 F.2d 890, 894 (Fed.Cir.1992) ("[B]y its terms, section 1552(c) does not mandate pay at all. Rather, it provides for appropriate discretionary payment by the Secretary in certain circumstances."). The *Dehne* court held that the veteran had failed to state a claim on which relief can be granted; *Blum* was not cited. The apparent conflict in the law is resolved by our established rule that earlier precedents must be followed unless changed by an en banc court.

The Court of Claims early on made clear that it had jurisdiction to directly review decisions by the Correction Boards. *See Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 811 (1979) (en banc) ("[W]e have reviewed these board actions with great frequency since 1951 when the present correction board statute became law, explicitly authorizing the payment of claims consequent upon the correction of military records."). Yet a few cases made a point of noting that when the Correction Board decision involved only partial relief, the court had power to review the case under the so-called half-a-loaf theory, meaning that a complainant was entitled to full relief, not partial, and that justified judicial intervention. *See, e.g., DeBow v. United States,* 193 Ct.Cl. 499, 434 F.2d 1333, 1335 (1970).

Whatever one wishes to make of the various turns and twists announced in cases decided over several decades, the issue before us remains straightforward: when the Army Correction Board undertook to decide Captain Martinez's appeal, were the statute and regulations governing the Board such that the consequences of a decision in his favor would be money-mandating? If the answer to that is yes, a petition, in a well-pleaded complaint, seeking review in the Court of Claims from a negative decision states a cause of action under the Tucker Act.

The majority opinion does not explain why § 1552 and the cited regulations adopted thereunder, not to mention prior governing precedent, do not satisfy the money-mandating requirement. What we get is a replay of the Government's circular argument. It begins with the premise that there is really only one cause of action in these cases, the original discharge cause of action; any further review, such as that of the Correction Board, is "ancillary," results from, is a consequence of, the original

cause of action; therefore there is no second cause of action when the Correction Board wrongfully acts, only the first cause of action being reheard a second time. That of course is entirely circular, since it begins with the conclusion that is the question.

The argument posed in that fashion avoids the fundamental question of the legal consequences that attach to a decision by a Correction Board. The failure to grasp the nettle is illustrated by the majority's hypothetical, used to illustrate its view of the law. *See* Maj. op. at 1312. The question is posed whether a decision by an agency official, who has power to grant relief from an agency's decision, could possibly create a new cause of action, one that is independent of the agency's earlier decision. The answer given by the majority is "if the agency official denied a particular claim, it would not make sense to say that the denial would give rise to a second accrual of the original claim, so that the statute of limitations for a Tucker Act action on that claim would begin anew as of the date of the agency official's denial." That's it; end of case.

If that argument arose in court, I would ask, "Why not, why doesn't it make sense? What are the consequences that attach to an affirmative decision by the agency official? Are there statutes and regulations we need to consider? Could the agency official's decision be considered money-mandating under the law? What about the *Blum* decision (quoted above), which holds that a negative decision is as much money-mandating as an affirmative one? And what about *Sanders* and *Blum* together, holding that Correction Board decisions—your agency official analog—are independently reviewable by our court, and that the law governing the Boards is money-mandating?" At the least we would have a lively discussion.[1]

### 3.

Martinez's case does not stand simply on concluding that *Hurick* was in error, though an error repeated. Even if I were not persuaded that *Hurick* was wrongly decided, and even assuming that, at the time they were decided, *Hurick* and other military discharge cases could plausibly have relied on language in *Friedman*, it is clear today, in light of the now-effective statutes and regulations, that when a Correction Board decides a wrongful discharge case, such decision can be found to create a cause of action that is separate from the original discharge decision. At least that is the conclusion reached by every other federal court of appeals that has addressed the question; these circuits uniformly allow veterans six years to request judicial review of a Correction Board decision.

Other circuits get involved in these cases because a veteran who wishes to have judicial review of an adverse decision of a Correction Board regarding his discharge from the military, but eschews any interest in a money claim against the Government as a consequence of the discharge, has an alternative to a Tucker Act-based suit. Such a plaintiff can seek review of the decision of the Correction Board in a federal district court under the Administrative Procedure Act (APA), 5 U.S.C. § 702

---

1. In response to the dissent, the majority favors us with yet another hypothetical, this time rising all the way to the Secretary of Defense. These are interesting academic inquiries, which might be relevant if they were supported by an explication of detailed statutes and regulations such as those under which the Army Correction Board operates. It is the legal fabric of decision, not the fact that a decision is possible, that determines what qualifies as "money-mandating."

*et seq.* The suit will be decided under the law of, and reviewed on appeal by, the appropriate regional circuit court of appeals. The difference stems from whether the veteran requests a purely administrative remedy—for example, purging of the record, reinstatement, promotion—or whether the veteran as part of the relief sought would be entitled to a monetary award for denied pay.

In the purely administrative remedy context, the action is based on § 702 of the APA, which waives the United States's sovereign immunity for claims in certain cases involving a decision of an administrative agency. The military services are considered administrative agencies for this purpose.

The Second Circuit addressed the issue in *Blassingame v. Secretary of the Navy*, 811 F.2d 65, 68 (2d Cir.1987). A Vietnam veteran sought upgrade of an undesirable discharge to an honorable discharge. The Navy's Correction Board (as well as its Discharge Review Board, *see* 10 U.S.C. § 1553(a)) had denied relief. Thirteen years after his discharge, but within one year of the Correction Board decision, suit was brought in federal district court. The district court held, inter alia, that the statute of limitations barred the suit to review the decision of the Correction Board.

The Court of Appeals reversed, holding: (1) since the veteran had expressly relinquished his demand for monetary damages, appeal was properly in the Second Circuit, and not in the Federal Circuit under the Tucker Act; (2) the jurisdiction of the district court lay under 28 U.S.C. § 1331(a), federal question jurisdiction, and APA § 702, waiver of sovereign immunity; (3) the six year statute of limitations for civil actions against the United States, 28 U.S.C. § 2401(a), applies, but the cause of action accrues at the time of the Correction Board decision, not, as the Govern-

ment argued and the district court held, from the time of the underlying discharge.

In reaching that conclusion, the Second Circuit reviewed the history of the 1940s legislation establishing the several boards, and the development since then of judicial review of agency action under the APA. The court noted particularly the emphasis placed by the Supreme Court in *Harmon v. Brucker*, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), on judicial review of agency action unless there is clear and convincing evidence that Congress intended to foreclose such review. *Blassingame*, 811 F.2d at 71.

The court pointed out that the Government's view to the contrary would in some circumstances preclude altogether judicial review of Correction Board action. That circumstance, the court noted, could occur in a number of ways. For example, by statute veterans have fifteen years to take certain discharge cases to the Discharge Review Board, 10 U.S.C. § 1553(a), and three years after that to appeal the Review Board's decision to the Correction Board, 10 U.S.C. § 1552(b). Under the Government's view, a veteran whose board reviews were completed within six years from the date of discharge could obtain judicial review, but a veteran whose board reviews extended beyond that would be denied any judicial review. As the court emphasized, that created disparate results, and was inconsistent with *Harmon* in that there was no reason to think Congress intended to preclude judicial review of agency action in that fashion. *Blassingame*, 811 F.2d at 71–72.

The Second Circuit took particular note of the Federal Circuit's contrary position in *Hurick*, saying:

> Although we acknowledge the vast experience of the Federal Circuit and its predecessor regarding challenges by veterans to their discharges, we note

that the leading case relied on by that circuit, *Friedman* was decided in 1962, before it became clearer over the intervening years that there is a presumption in favor of judicial review of agency action.

*Id.* at 71.

In reaching its conclusion that the cause of action accrues at the time of the Correction Board decision, not at the time of the underlying discharge, the Second Circuit followed with approval the same conclusion reached in similar cases in the Third, Fifth, and Tenth Circuits. *See Dougherty v. United States Navy Bd. for Corr. of Naval Records,* 784 F.2d 499 (3d Cir.1986); *Geyen v. Marsh,* 775 F.2d 1303 (5th Cir. 1985); *Smith v. Marsh,* 787 F.2d 510 (10th Cir.1986). No circuit other than ours follows *Hurick.*

The decision of the Second Circuit, citing that of the Fifth, particularly noted that review of a Correction Board decision should be distinct from direct review of the underlying discharge because, although the factual record may be similar, the focus of the former is on the action of the Correction Board rather than on that of the discharge officials. *Blassingame,* 811 F.2d at 72; *Geyen,* 775 F.2d at 1308–09. As in the case before us, the Correction Board may consider evidence not in the original record, 32 C.F.R. § 581.3(c)(2)(iii), and, in cases in which the veteran was required to apply first to a Discharge Review Board, it must also consider policy and procedure changes implemented subsequent to the discharge. *Geyen,* 775 F.2d at 1308–09 (citing 32 C.F.R. § 70.9(c)(1), which provides Army Discharge Review Board standards); *see also Blassingame,* 811 F.2d at 72–73 (citing 32 C.F.R. § 724.903, which provides Naval Discharge Review Board standards). The issue for judicial review as these courts see it is whether, on the factual record before the Correction Board, its decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Blassingame,* 811 F.2d at 72; *Geyen,* 775 F.2d at 1309.

In support of the majority's refusal to change this circuit's position on the matter, it might seem that, in light of the opportunity provided in these other circuits, there is no particular reason why we should bother to correct our law. But getting a case into a regional circuit under the APA, and avoiding the consequences of this circuit's *Hurick* decision, may not be as simple as it first appears. *See Mitchell v. United States,* 930 F.2d 893 (Fed.Cir. 1991). Equally importantly, the current scheme tends to discourage a veteran, who seeks monetary as well as other relief, from exhausting available administrative remedies before filing suit in federal court. A veteran who seeks only correction of his records—for example, when the only issue is whether a discharge should be upgraded from less than honorable to honorable— has six years from the date of a Correction Board decision to file a claim under the APA in federal district court, so there is little reason not to await the Correction Board decision before requesting judicial review. A veteran who challenges the nature of his discharge but whose suit incorporates money damages, however, must file a claim in federal court within six years of his initial discharge. Thus, he may need to file a claim in the Court of Federal Claims or district court before the Correction Board issues its decision, or in some cases before he has even applied to the Correction Board. This can be both wasteful and unnecessary.

4.

In my view, applying the correct law to the case of Mr. Martinez results in his getting his day in court; his challenge to

the Correction Board's adverse decision would not be barred by the statute of limitations.

Mr. Martinez would be free to pursue his argument that the Correction Board acted arbitrarily and capriciously. I believe he has a well-pleaded complaint against the Board. With regard to the Article 15 proceeding under which Captain Martinez was punished, the Correction Board first stated that

> nonjudicial punishment [NJP] is appropriate in all cases involving minor offenses in which nonpunitive measures are considered inadequate or inappropriate. It is a tool available to commanders to correct, educate and reform offenders ...; to preserve a member's record of service from unnecessary stigma ...; and to further military efficiency by ... requiring fewer resources than trial by court-martial.

Then, however, despite its recognition of the usefulness of the Article 15 proceeding in military discipline cases, the Board summarily concluded that "it [is] improbable that anyone would accept the NJP procedure, with its relaxed rules of evidence, if he truly believed that he was guiltless unless they believed that a trial by court-martial would elicit even more damaging information." Further, the Correction Board, in a one-sentence finding without further explanation, stated that Mrs. Martinez's sworn statement to the effect that the charges against Captain Martinez were phony was "unconvincing" since "she probably has a vested interest in the continuation of [Martinez's] career."

An opportunity for judicial review of administrative action is an essential element of due process. Applied to this case, it would afford an opportunity to test, among other issues, whether the Correction Board's view, that anyone who was guiltless would not accept the Article 15 Non Judicial Punishment procedure under the Uniform Code of Military Justice, expressed a view of the law inconsistent with basic Constitutional principles, and with the Army's own rules.[2] To deny Martinez this opportunity is to deny a fundamental right, one clearly present under established law. At the same time, the Government would have the opportunity to show, if it can, that there is substantial evidence in the record to support the Board's declaration dismissing Mrs. Martinez's sworn statement on the basis of a possible interest in Mr. Martinez's career, a declaration Mr. Martinez alleges is without any record support.

In view of the manner in which I would decide this case, I find it unnecessary to address the other issues raised by Mr. Martinez, and dealt with at length by my colleagues. I respectfully dissent from the court's failure to provide Mr. Martinez with the process that is his due.

**2.** See *Record of Proceedings Under Article 15, UCMJ,* an executed copy of which was in the record before the Board, which states that, before a service member can be punished under Article 15, the deciding officer must be "convinced beyond a reasonable doubt that you committed the offense(s)." DA Form 2627, *Record of Proceedings Under Article 15, UCMJ,* para. 2, in this case completed and signed by BG Kilmartin. *Accord* U.S. Dep't of Army, Reg. 27–10, Legal Services: Military Justice, para. 3–18 (Aug. 20, 1999).